UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, FOR THE USE AND BENEFIT OF ASH EQUIPMENT CO., INC. D/B/A AMERICAN HYDRO; AND ASH EQUIPMENT CO., INC., A MARYLAND CORPORATION;<br><br>Plaintiffs,<br><br>vs.<br><br>MORRIS, INC., A SOUTH DAKOTA CORPORATION;  UNITED FIRE AND CASUALTY COMPANY, AN IOWA CORPORATION; AND  RED WILK CONSTRUCTION, INC., A SOUTH DAKOTA CORPORATION;<br><br>Defendants. | 4:14-CV-04131-VLD<br><br><br>ORDER DENYING IN PART AND GRANTING IN PART<br>THE PARTIES' VARIOUS MOTIONS FOR PARTIAL SUMMARY JUDGMENT<br><br>DOCKET NOS. 140, 153 & 170 |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................... 1

FACTS ........................................................................................................... 1

   A.  Contractual Relations Between the Parties ............................................... 1

   B.  Hydrodemolition ..................................................................................... 2

   C.  Hydro's Pre-Contract Proposals ............................................................. 4

   D.  Disputes While Work Was Progressing ................................................... 6

      1.  Start Time ......................................................................................... 6

      2.  Red Wilk's Alleged Breaches ............................................................. 7

      3.  Manholes ........................................................................................... 9

      4.  Measurement of Concrete Removal .................................................. 10

      5.  The End ........................................................................................... 12

   E.  Claims Asserted by the Parties .............................................................. 13

   F.   Arguments in Favor of Partial Summary Judgment ............................... 13

      1.   Hydro's Motion for Partial Summary Judgment ................................... 13

      2.   Red Wilk's Motion for Partial Summary Judgment ........................... 14

      3.   Morris' Motion for Partial Summary Judgment .................................. 14

**DISCUSSION** ............................................................................................ 15

  A.   Summary Judgment Standard ................................................................ 15

  B.   South Dakota Contract Law ................................................................... 16

  C.   Hydro's Motion for Partial Summary Judgment .................................... 18

      1.   Liability on Miller Act Claim ................................................................ 18

      2.   Whether Red Wilk's Liquidated Damages Are Enforceable ................. 25

          a.   Validity of Liquidated Damages as a Matter of Law ....................... 25

          b.   Waiver of Liquidated Damages .................................................... 42

      3.   Red Wilk's Counterclaim ...................................................................... 44

          a.   Notice and Opportunity to Cure ................................................... 44

          b.   Red Wilk Caused its Own Damages ............................................. 49

          c.   Whether Red Wilk's Damages are Speculative .............................. 49

          d.   Manholes ................................................................................... 50

  D.   Red Wilk's Motion for Partial Summary Judgment ............................... 58

      1.   Request for Extension of Time .......................................................... 59

          a.   Section 9.6 ................................................................................. 59

              i.   Damages are Not Limited........................................................ 59

              ii.   Hydro Requested an Extension of Time .................................. 62

          b.   Acceleration Damages ................................................................ 65

          c.   Section 16.2 ............................................................................... 68

      2.   Delay Damages in Favor of Hydro ....................................................... 71

  E.   Morris' Motion for Partial Summary Judgment ..................................... 78

      1.   Survey Requirement ........................................................................... 79

      2.   Quantum Meruit ................................................................................. 84

      3.   Lost Productivity Damages ................................................................. 90

**CONCLUSION** .......................................................................................... 92

## INTRODUCTION

This is a Miller Act action (40 U.S.C. § 3133(b)(3)(B)), brought by the United States of America for the use and benefit of Ash Equipment Company, Inc., doing business as American Hydro ("Hydro").  Defendants are the general contractor on the project, Morris, Inc. ("Morris"); the company that issued the payment bond, United Fire and Casualty Company ("UF&CC"); and subcontractor Red Wilk Construction, Inc. (Red Wilk).  Pending before the court are motions from each party for partial summary judgment in their respective favors.  See Docket Nos. 140, 153 & 170.  This matter is before this court on the consent of all parties pursuant to 28 U.S.C. § 636(c).

## FACTS

### A.    Contractual Relations Between the Parties

Defendant Morris contracted with the United States Army Corps of Engineers ("the Corps") to do work on the Fort Randall Dam spillway at Pickstown, South Dakota, in September, 2013.  Work on the spillway was necessitated (in part) due to a flood which occurred in the summer of 2011.  The project included removal and replacement of damaged concrete.  Morris obtained a Miller Act payment bond on the project from defendant UF&CC in the amount of $7,472,670.25.  The payment bond obligated Morris and UF&CC jointly and severally to guarantee payment to any subcontractor of Morris' who furnished labor and materials on the project as well as to persons who had a direct contractual relationship with Morris on the project.

The project plans and specifications of the Corps required concrete removal using, in part, hydrodemolition methods. Morris subcontracted the hydrodemolition work to Red Wilk in October, 2013. Red Wilk in turn subcontracted with Hydro on April 9, 2014. See Docket Nos. 158-1 and 158-2.[1] Red Wilk promised to pay Hydro for Hydro's work on the project within 10 working days after Morris paid Red Wilk on monthly progress payments. Specific provisions of these three contracts are discussed in depth below in the DISCUSSION section of this opinion.

**B.      Hydrodemolition**

Hydrodemolition is the process of removing concrete with high-pressure water jets mounted on a robot. A hydrodemolition system includes three main components: (1) the robot; (2) high-pressure pumps which operate on diesel or electricity and deliver to the robot up to 100 gallons of water per minute at pressures up to 40,000 pounds per square inch; and (3) a trailer holding the pumps, spare parts, tools, fuel, water, hoses and filters. The depth of a cut is determined by the force of the water coming out of the robot's jets and how long

---

[1] Three separate copies of the Red Wilk-Hydro contract were filed with the court. See Docket Nos. 158-1, 158-2, and 158-3. Docket No. 158-1 is a complete copy of the contract together with all the hand-written changes and acknowledgements of those changes made by the contracting parties. It is, however, difficult to read. Docket No. 158-3 is a similar copy, but parts of the contract are obscured by sticky-notes and page 14 is missing altogether. Docket No. 158-2 is the original typewritten portions of the contract but it is missing the handwritten changes and initials. The court cites to both Docket No. 158-1 and 158-2 throughout this opinion so that the reader has a version that is readable and also one containing the handwritten additions. In addition, whoever scanned the contract found at Docket No. 158-2 mixed up pages 16-18. Therefore, the page numbers assigned by CM/ECF (the court's electronic docketing system) do not correspond to the page numbers on the contract itself at the bottom of each page. When the court cites to page numbers, it is citing to the page number of the actual contract as indicated at the bottom of each page of the contract.

the jets linger over an area of concrete. The deeper the cut, the more water force and time required. In addition to supplying copious amounts of water on the front-end of the process for the robot's jets, hydrodemolition also requires prompt removal of waste water.

The removal of waste water is important for three reasons. First, only upon removal of wastewater can the operator of the robot assess how deeply and cleanly the concrete is being demolished and, therefore, whether the pressure or time being used should be adjusted. Second, if wastewater is allowed to pool over the cutting site, the jetted water from the robot hits the pool first rather than directly hitting the concrete. This diminishes the power of the jets to cut the concrete because the pool of wastewater deflects, to some extent, the power of the water emanating from the jets. Finally, if wastewater is not quickly and efficiently removed, the particles in the wastewater can resettle in the cut area and resolidify, essentially filling in or partially filling in a cut that has been made.

The robot used for hydrodemolition in this case weighed approximately 7,000 pounds. Needless to say, it is not an easy piece of equipment to move around. Maximum efficiency for using the robot dictates that all of the concrete removal in a particular area be done at the same time rather than skipping around doing spot removals in numerous different areas. Further, if the robot is cutting concrete on a slope, it has to be secured with tethers. The tethering must be relocated whenever the robot is moved to another area on the slope. These details of hydrodemolition are important to know in order to understand the parties' disputes.

## C.    Hydro's Pre-Contract Proposals

Prior to Red Wilk and Hydro entering into their finalized contract, Hydro submitted four proposals to Red Wilk.  Hydro's first proposal dated July 29, 2013,[2] included unit prices for hydrodemolishing 47,375 square feet of concrete to a 6-inch depth, 40,500 square feet of concrete to a 10-inch depth, and 6,400 square feet at 16 manhole locations to an 18-inch depth.  See Docket No. 159-1.  Different rates applied depending on the depth of the concrete removal and whether the removal was taking place upstream of tier 46 or downstream of tier 46.  Id.  The upstream-downstream designation had to do with whether the hydrodemolition occurred on a horizontal surface or a slope—the downstream area was the sloped area.

The second proposal submitted by Hydro was dated August 22, 2013. See Docket No. 161-1.  This proposal reiterated the offer to remove 40,440 square feet of concrete at the six-inch depth upstream, 6,935 square feet at the six-inch depth downstream, 29,575 square feet at a 10-inch depth upstream, and 10,925 square feet at a 10-inch depth downstream.  Id.  This second proposal did not include an offer to do any manhole work denominated by name; nor did the proposal include any 18-inch demolition which was associated with manhole work.  Id.

The third proposal submitted by Hydro was dated August 30, 2013, and includes the same exact amount of square footage for removal of concrete at the six-inch and ten-inch depths (47,375 square feet and 40,500 square feet respectively).  See Docket No. 159-2.  The third proposal changed the description for removal of concrete at the 18-inch depth.  Id.  This offer reinserted an offer to

---

[2] The date of this proposal may have been wrong.  The actual date of the proposal may have been August 29, 2013.  See Docket No. 166-9 at p. 28.

do manhole work. It described hydrodemolishing "any work upstream" to a depth of 18 inches at a rate of $55.88 per square foot and $67.58 per square foot for "any work downstream" at the 18-inch depth. Id. Hydro's third proposal for removal to a depth of 18 inches did not include a total square footage associated with the 18-inch depth. Id. Hydro submitted a fourth proposal dated April 2, 2014, which was identical to its third proposal in terms of its description of square feet of concrete to be removed, depth of removal, and rates for removal. Compare Docket No. 159-2 with Docket No. 159-3.

All four of Hydro's written proposals indicate a spring, 2014, start date and also indicate that Hydro required a minimum of three weeks' notice prior to beginning work. See Docket Nos. 159-1, 161-1, 159-2, all at page 1, and 160-8, at page 2. The contract between Red Wilk and Hydro was signed April 9, 2014. Three weeks from April 9 was April 30, 2014.

Hydro's first proposal set 207 working days as the time Hydro needed to complete the work. See Docket No. 159-1 at p. 2. Hydro's second proposal reduced the total time needed to complete the work to 169 days. See Docket No. 161-1 at p. 2. The third proposal further reduced the proposed work time to 165 days. See Docket No. 159-2. Hydro's fourth and final proposal was for 83 days, which was adopted in the parties' final contract dated April 9, 2014. Compare Docket No. 160-8 at p. 2; with Docket No. 158-1 at § 9.3; Docket No. 158-2 at § 9.3.

**D.      Disputes While Work Was Progressing**

**1.      Start Time**

The subcontract had a project completion date of August 1, 2014.  <u>See</u> Docket No. 158-1 at p. 15, § 9.3; Docket No. 158-2 at p. 15, § 9.3.  The subcontract was to be performed over 83 working days, with Sundays and public holidays excluded (a six-day work week).  <u>See</u> Docket No. 158-1 at p. 6, § 4.1.16; Docket No. 158-2 at p. 6, § 4.1.16.  A working day was to be 10 hours long and begin at 7:00 a.m.  <u>Id.</u>  The contract stated that the date of commencement of the contract was to be calculated from the date of completion.  <u>Id.</u> at p. 14, § 9.1. Unless otherwise provided, the start date was to be the date the agreement was executed.  <u>Id.</u>  Counting backwards from August 1, 2014, the contract would have needed to be begun by April 24, 2014, in order to run for 83 days (excluding all Sundays, Memorial Day and Independence Day) and to be completed on August 1, 2014.  The contract specified that "time is of the essence."  <u>Id.</u> at p. 15, § 9.4.

Disputes between Hydro and Red Wilk materialized almost immediately. Despite representations in its proposals that it could start work with three weeks' notice, Hydro asserts it orally told Red Wilk before the contract was entered into that it could not begin working on the project until late May or even potentially early June.  If supplied with the necessary water, removal of waste water, and continuous cutting as specified in the contract, Hydro alleges it could have met the target completion date of August 1 with far less than 83 working days.  Red Wilk issued a demand on April 28 that Hydro begin work immediately, insisting that the contract required Hydro to have begun work on April 21.  Hydro mobilized and

arrived on the job site on May 7. After setting up its equipment, Hydro was ready to begin work at noon on Friday, May 9.

When Hydro arrived, however, it was not able to begin working. The Corps required Red Wilk to test the berm which would contain the wastewater from hydrodemolition before beginning work. Red Wilk had not performed the necessary testing of the berm before Hydro arrived. Hydro actually began work on Tuesday, May 13. The contract between Hydro and Red Wilk provided in §§ 8 and 10.3 for payment of $3,000 per day to Hydro for "idle and standby charges," that is, time Hydro was forced to wait around doing nothing because of Red Wilk. Hydro billed Red Wilk and Red Wilk paid $3,000 per day for the days Hydro spent idle waiting for the start of hydrodemolition.

Red Wilk agrees Hydro orally told it when it could start, but alleges Hydro told Red Wilk it could start three weeks after the contract was signed, consistent with Hydro's written proposals. Red Wilk asserts that the parties discussed and agreed upon a specific start date of April 21, 2014, while the parties were at a pre-project meeting on March 25, 2014.

## 2.    Red Wilk's Alleged Breaches

Once Hydro was able to begin work, Hydro alleged that Red Wilk failed in its contract requirements in several respects. Hydro asserts the contract required Red Wilk to order Hydro's work so as to provide two phases maximum of continuous cutting. This provision meant, according to Hydro, that Red Wilk was obligated to order Hydro's work so as to provide one phase of cutting at the D wall and half of the gates and one phase of cutting at the E wall and half of the gates. See Docket No. 203-6 at pp. 8-9; Docket No. 167-2. This provision, according to

Hydro, was intended to allow Hydro to perform hydrodemolition without having to relocate its robot, pumps, and trailer more than two times. Id. Instead, Hydro alleges Red Wilk required Hydro to perform hydrodemolition in small patches all around the work site, requiring Hydro to relocate its equipment nine to ten times. Id. at p. 10.

Red Wilk was to supply Hydro with 300 gallons of water per minute for hydrodemolition and Hydro alleges Red Wilk did not consistently do so. Red Wilk was also supposed to continuously clean the cuts made by Hydro so Hydro could see whether it was cutting sufficiently, which Hydro also alleges Red Wilk failed to do consistently.

Hydro also alleges Red Wilk was to make saw cuts around the areas to be hydrodemolished as required by the Corps' plans and specifications. Hydro alleges Red Wilk failed to make these saw cuts, with the result that Hydro could not see the outlines of the area to be cut once it was inundated with water and concrete waste.

Finally, Hydro alleges Red Wilk failed to provide sufficient containment for the waste water from the hydrodemolition, with the result that waste water flooded over areas to be cut, reducing the effectiveness of Hydro's equipment which was then forced to cut into a "pond" instead of directly cutting into concrete.

Hydro alleges its fell behind schedule due to Red Wilk's breaches. Hydro requested an extension of the August 1 deadline set by the contract due to this situation. Red Wilk refused the request, insisting on completion of the work by August 1. Therefore, Hydro attempted to accelerate its work by bringing in additional employees and equipment. Hydro alleges Red Wilk refused to allow

Hydro to utilize these additional workers and equipment because Red Wilk could not answer the demand for additional support services, particularly it was not able to accommodate the increase in wastewater to be handled if Hydro increased its hydrodemolition pace.  See Docket No. 203-6 at p. 10.

### 3.    Manholes

Red Wilk claims that Hydro was responsible for hydrodemolishing around the perimeter of manholes and refused to carry out this work.  Hydro claims that hydrodemolition around manholes was not covered by its contract with Red Wilk. The original Corps plans and specifications called for 18-inch hydrodemolition around manholes, as well as less than 8-inch and more than 8-inch hydrodemolition in other places.

The final contract between Red Wilk and Hydro calls for hydrodemolition only at 6-inch and 10-inch depths.  See Docket Nos. 158-2 at pp. 13-14; 158-3 at pp. 13-14.  The square footage for removal at the six- and 10-inch depths matches exactly all four of Hydro's pre-contract proposals for hydrodemolition of concrete at the six-inch and ten-inch depths:  47,375 square feet for six-inch depth removal and 40,500 square feet for ten-inch depth removal.  Id.  The final contract contains no mention of removal of concrete at the manholes specifically nor does it contain any provision for removal of concrete to a depth of 18 inches.  Id.  Hydro claims the final contract it entered into with Red Wilk did not include the manholes.

Red Wilk claims the Corps amended its plans and specifications with an addendum on August 30, 2013, changing the hydrodemolition depth for manholes to 10 inches, instead of 18 inches.  Hydro claims it never received the Corps' August 30, 2013, addendum.  Red Wilk claims it provided the amendment to

9

Hydro via email. However, Red Wilk has never produced a copy of any email documenting this delivery.

The Corps' August 30, 2013, amendment does change the work with regard to manholes, but the amendment is unclear with regard to the required depth of hydromilling around manholes or the square footage of concrete to be removed in connection with manholes. The amendment was made in response to a question. Both the question and the Corps' answer, which were incorporated into the Corps contract, are as follows:

> Q2: Note 1 on sheet S-501 states to remove concrete by hydrodemolition methods as necessary to install manholes. The slab needs to be removed completely. Would it not make better sense to sawcut full depth and remove concrete? Hydrodemolition of 18" thick concrete is very costly.
>
> A2: Full depth saw cutting will be allowed within the extents of the manhole. The area around the manhole will need to be hydromilled to facilitate the repaired condition lap splice or mechanical splice of the rebar.

See Docket No. 160-2. It is clear from this Q & A that the Corps dispensed with the requirement of 18-inch hydrodemolition around manholes. In its place, the manholes were to be sawcut, something that was outside of Hydro's contract, which dealt only with concrete removal through hydrodemolition. However, the Corps continued to require some hydromilling around manholes, though at an unspecified depth and unspecified square footage.

### 4. Measurement of Concrete Removal

The general contract between Morris and the Corps contains several provisions for concrete removal. See Docket No. 156-4 at pp. 6-8, Parts 1, 2. Concrete removal under the general contract is to be measured by the square foot, with measurement made by a survey of the removal limits. Id. at pp. 7-8, Parts 1,

2, ¶¶ 1.2, 2.2.  Payment is then to be made by multiplying the unit price by the number of square feet of concrete removed and accepted.  Id.  The terms of the prime contract are incorporated by reference into the contract between Hydro and Red Wilk.  The prime contract calls for hydrodemolition of a total of 81,775 square feet of concrete.  See Docket No. 160-2 at pp. 4, 7-8.  The contract between Hydro and Red Wilk called for the removal of 87,875 square feet of concrete (47,375 square feet at a depth of six inches; 40,500 square feet at a depth of ten inches).[3] See Docket Nos. 158-2 at pp. 13-14, and 158-3 at pp. 13-14.

Morris asserts that the only true survey made of the concrete removal was made by itself on September 15, 2014, and showed that Hydro had removed 57,776 square feet of concrete.  It seeks to limit Hydro's claim for unpaid concrete removal to this figure.  Hydro counters that Morris billed the Corps and was paid for removal via hydrodemolition of 62,000 square feet of concrete.[4]  However, Morris asserts that approximately 6,000 square feet of this 62,000 figure was work done by Hydro's successor on the job site, 2X Hydro-Demolition, LLC, thus leaving Hydro's portion at 57,776.

Hydro submitted progress billings to Red Wilk as its work progressed and Red Wilk in turn billed Morris accordingly.  Between May, 2014, and December,

---

[3] Actually, even within the subcontract there are discrepancies in the total amount of concrete to be removed.  Sections 8 and 10.3 quoted above show a total of 87,875 square feet, but section 9.3 shows 87,720 square feet.

[4] This issue is muddled still further by the fact that Morris in fact originally billed the Corps and was paid for removal of 68,000 square feet of concrete.  This figure was later determined to be an overbilling/overpayment of 6,000 square feet.  See Docket No. 215-1.  Morris and the Corps rectified their accounts so as to compensate for the error.

2014, Morris paid Red Wilk $1,248,914.10 for Hydro's work on the project. However, Red Wilk in turn only paid Hydro $475,074 for its work.

### 5. The End

On July 29, 2014, Hydro left the project site. <u>See</u> Docket No. 197-12 at pp. 102-03. There was additional hydrodemolition work due under the contract. However, Red Wilk had never supplied Hydro with a schedule for work. Each day Hydro would have to consult with Red Wilk to get its instructions for work for that day. On Friday, July 25, 2014, Walter "Red" Wilk, owner of Red Wilk, was on the job site but refused to speak to Hydro.[5] No one else from Red Wilk gave Hydro instructions as to what work to perform. Hydro sent its workers home for the day. No one from Red Wilk was on the job site the next day, Saturday, July 26, 2014, either and no one contacted Hydro with instructions via phone. Hydro sent its crew home that day as well. On Monday, July 28, 2014, Walter Wilk was on the job site. When Hydro asked for direction as to work, Walter told Hydro the only work available for Hydro were the manholes. <u>See</u> Docket No. 167-1 at p. 66. Since this was a disputed issue and Red Wilk refused to give Hydro any other work, Hydro withdrew from the job site. <u>Id.</u> at 65-66.

Hydro returned twelve days later on August 11, 2014, to finish the remaining work. <u>See</u> Docket No. 203-23 at pp. 64-66. Hydro brought this lawsuit on August 22, 2014, but stayed on the job site until August 25 finishing work. The parties dispute whether, at the time Hydro made its final departure on August

---

[5] Hydro employee Tony Head overheard Walter talking on his phone at approximately 7 a.m. stating that he had sold his company, Red Wilk Construction, Inc. <u>See</u> Docket No. 167-1 at pp. 67-68. After the phone call ended, Tony asked Walter three times to please answer some questions about work Hydro was to do. Walter refused to do so. <u>Id.</u>

25, there was any defective work needing to be remedied which Hydro knew of and refused to remedy. The parties also dispute whether Hydro completed all of its work due under the contract because Red Wilk asserts Hydro promised to hydrodemolish the manholes and did not do so. Red Wilk also asserts there were additional areas above tier 46 that still needed to be hydrodemolished which Hydro did not complete before leaving the job site.

**E.      Claims Asserted by the Parties**

Hydro gave notice to Morris that it had not been paid. In its complaint, Hydro asserts a common law breach of contract claim against Red Wilk, an equitable claim in *quantum meruit* against Morris, and a Miller Act claim against the UF&CC bond.

Morris and UF&CC asserted a cross-claim against Red Wilk, seeking indemnification and setoff for any damages Hydro might obtain from Morris and/or UF&CC on account of Red Wilk's actions.

Red Wilk counterclaimed against Hydro. Red Wilk asserted a breach of contract claim, asserting Hydro did not perform all work called for by its contract, it performed incomplete and nonconforming work, and it left the project work site without finishing its work. Red Wilk also asserted a claim for liquidated damages against Hydro pursuant to their contract. Finally, Red Wilk asserts the equitable defenses of unclean hands and unjust enrichment.

**F.      Arguments in Favor of Partial Summary Judgment**

**1.      Hydro's Motion for Partial Summary Judgment**

Hydro moves for partial summary judgment [Docket No. 170] on the following grounds: (1) Hydro has established liability on its Miller Act claim and

only damages should be tried; (2) Red Wilk's claim for liquidated damages should be dismissed because the liquidated damages provision in the contract between Red Wilk and Hydro is not enforceable; and (3) Hydro is entitled to judgment as a matter of law on Red Wilk's counterclaims:  (a) because Red Wilk did not give Hydro notice and an opportunity to cure any alleged defects; (b) because Red Wilk caused its own damages; (c) because Red Wilk's damages calculation is too speculative; and (d) because manholes were not part of the contract between Hydro and Red Wilk.

### 2. Red Wilk's Motion for Partial Summary Judgment

Red Wilk moves for partial summary judgment on the following grounds:  (1) because Hydro did not request an extension of time to complete its work Hydro is not entitled to money damages or acceleration costs; and (2) Hydro's exclusive remedy for delay caused by Red Wilk is the $3,000 per day delay damages specified in the contract between Red Wilk and Hydro.

### 3. Morris' Motion for Partial Summary Judgment

Morris seeks partial summary judgment on three issues:  (1) it seeks to limit Hydro's damages to the amount of concrete removal demonstrated by the September 15, 2014, survey it conducted; (2) it seeks dismissal of Hydro's *quantum meruit* claim against Morris; and (3) it seeks to limit Hydro's damages for "lost productivity" to those liquidated damages specified in the Red Wilk-Hydro contract for idleness or delay.

**DISCUSSION**

**A.   Summary Judgment Standard**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 248. "Only

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 93–95 (3d ed. 1983)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

## B.     South Dakota Contract Law

The parties agree that South Dakota law applies in this case. See Secura Ins. v. Horizon Plumbing, Inc., 670 F.3d 857, 861 (8th Cir. 2012) (State law governs the interpretation of a contract when federal jurisdiction is based on diversity of citizenship). "A contract is an agreement to do or not to do a certain thing." See SDCL § 53-1-1. The party asserting a breach of contract claim must prove (1) an enforceable promise, (2) a breach of that promise, and (3) resulting damages. Gul v. Ctr. for Family Medicine, 2009 S.D. 12, 762 N.W.2d 629, 633. Under South Dakota law, contract interpretation is a question of law. Cornelius v. Nat'l Cas. Co., 2012 S.D. 29, ¶ 6, 813 N.W.2d 167, 169; Lillibridge v. Meade School Dist. #46-1, 2008 S.D. 17, ¶ 9, 746 N.W.2d 428, 431.

When interpreting a contract, "effect will be given to the plain meaning of its words." In re Dissolution of Midnight Star, 2006 S.D. 98, ¶ 12, 724 N.W.2d 334, 337. Courts must "give effect to the language of the entire contract and particular words and phrases are not interpreted in isolation." Id. (internal citation omitted). When provisions of a contract conflict and full weight cannot be given to each provision, the more specific provision controls the more general provision as it is presumed the more specific clause reflects the parties' intention. Spiska Eng'g, Inc. v. SPM Thermo-Shield, Inc., 2007 S.D. 31, ¶ 21, 730 N.W.2d 638, 645; Bunkers v. Jacobson, 2002 S.D. 135, 653 N.W.2d 732, 738. Courts look "to the language that the parties used in the contract to determine their intention." Pauley v. Simonson, 2006 S.D. 73, ¶ 8, 720 N.W.2d 665, 667-68. In interpreting the contract, the court is to ascertain and give effect to the parties' intentions. Bunkers, 653 N.W.2d at 738.

If the language of the contract is clear and unambiguous, "it is the duty of [the] Court to declare and enforce it." Pauley, 2006 S.D. 73, ¶ 8, 720 N.W.2d at 668. However, if the contract is ambiguous, then "parol and extrinsic evidence may be utilized 'to show what [the parties] meant by what they said . . .' " Id. (quoting Jensen v. Pure Plant Food Internatl., Ltd., 274 N.W.2d 261, 264 (S.D. 1979)). "A contract "is ambiguous when it is fairly susceptible to two constructions." Fall River Co. v. South Dakota Public Assur. Alliance, 2001 S.D. 40, ¶ 6, 623 N.W.2d 735, 737. Where the identity of a crucial party named in a contract, such as "engineer," is not defined, parol evidence can and should be admitted to show who the "engineer" was and what its duties were vis-a-vis the

contracting parties.  <u>Subsurfco, Inc. v. B-Y Water Dist.</u>, 337 N.W.2d 448, 457 (S.D. 1983).

If a contract is ambiguous, it is construed strictly against the author of the contract.  <u>Ass Kickin Ranch, LLC v. North Star Mut. Ins. Co.</u>, 2012 S.D. 73, ¶ 9; 822 N.W.2d 724, 727; <u>Pete Lien & Sons, Inc. v. First American Title Ins., Co.</u>, 478 N.W.2d 824, 827 (S.D. 1991).  This is because the "language employed is that of the [author] and it is consistent with both reason and justice that any fair doubt as to the meaning of its own words should be resolved against it."  <u>Mut. Life Ins. v. Hurni Packing Co.</u>, 263 U.S. 167, 174 (1923).  However, the court may not seek out a "strained or unusual meaning."  <u>Chord v. Reynolds</u>, 1999 S.D. 1, ¶ 14, 587 N.W.2d 729, 732.  Where there is no ambiguity, however, a contract is construed according to the plain and ordinary meaning of its words.  <u>Pete Lien & Sons, Inc.</u>, 478 N.W.2d at 827.

## C.    Hydro's Motion for Partial Summary Judgment

### 1.    Liability on Miller Act Claim

The Miller Act provides that for any federal public works contract of more than $100,000, the general contractor who is awarded the contract must furnish a performance bond and payment bond with a satisfactory surety to the officer awarding the contract in an amount the officer considers adequate.  <u>See</u> 40 U.S.C. § 3131(b).  The payment bond is for the protection of all persons supplying labor or materials in carrying out the public works contract.  <u>Id.</u>

The purpose of these provisions is to protect subcontractors and materialmen who do not receive payment for their contributions to a project.  With a private owner, the subcontractor would be able to file a lien against the project to

ensure payment is made.  See F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., Inc., 417 U.S. 116, 121-22 (1974), superseded by statute on other grounds, 31 U.S.C. § 3905.  When the owner is the federal government, no such lien is allowable.  Id.  Hence, the Miller Act is designed to remedy this situation.  Consol. Elec. & Mech., Inc. v. Biggs Gen. Contracting, Inc., 167 F.3d 432, 434 (8th Cir. 1999).  Because it is remedial in nature, the Miller Act is to be broadly construed. Id.

The Miller Act further specifies:

(1) Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due.

(2) A person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made.  The action must state with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed.  The notice shall be served—
    (A) by any means that provides written, third-party verification of delivery to the contractor at any place the contractor maintains an office or conducts business or at the contractor's residence; or
    (B) in any manner in which the United States marshal of the district in which the public improvement is situated by law may serve summons.

See 40 U.S.C. § 3133(b)(1) & (2).

Here, no party disputes that Hydro was a person having a direct contractual relationship with a subcontractor (Red Wilk), but no direct contractual relationship with the contractor (Morris).  Accordingly, in order to present a *prima facie* case, Hydro must show it provided labor or materials on the project for which it has not been paid and that Hydro provided written notice to Morris of its claim within 90 days from when the last of the labor or materials were furnished.  Id.  No party disputes the timeliness of Hydro's notice to Morris nor the sufficiency of the content of that notice.  Nor does any party dispute that Hydro provided labor and materials for which it has not been paid—although the amount of Hydro's damages is hotly disputed.

Morris argues in opposition to Hydro's motion for partial summary judgment on its Miller Act claim that there are numerous issues with Hydro's request for damages under the Miller Act.  Furthermore, Morris suggests that submitting Hydro's contract damages to the jury will confuse the jury regarding what is compensable under the Miller Act.  Hydro concedes there are fact issues with regard to Miller Act damages, but emphasizes it is seeking only partial summary judgment as to Miller Act *liability.*

"A surety's liability under the Miller Act is measured by the general contractor's liability under the construction contract."  Consol. Elec. & Mech., Inc., 167 F.3d at 435.  But Miller Act claims are creatures of federal law, they "are separate and distinct from state law breach of contract actions."  Id.  One of the ways in which Miller Act claims are different from contract claims is that lost profits are not recoverable under the Miller Act.  Id.

"Labor" under the Miller Act includes not only physical, manual labor, but also technical and professional skill and judgment if it is done on the job site of the Miller Act project.  United States ex rel. Olson v. W.H. Cates Const. Co., Inc., 972 F.2d 987, 990-91 (8th Cir. 1992).  In addition, the on-site work must have been performed in order to complete the project, not to correct defects.  Id. at 991. In one case, an employee of the general contractor who had not been paid his full salary was allowed to prosecute a Miller Act claim consisting of his on-site supervisory work done on federal projects for his employer and not done for purposes of repairing defective work.  Id.  "Labor" does not include worker's compensation and comprehensive general liability insurance premiums.  United States ex rel. Cobb-Strecker-Dunphy & Zimmerman, Inc. v. M.A. Mortenson, Co., 894 F.2d 311, 312 (8th Cir. 1990).

A subcontractor who is damaged by delays on a project (where the delays are not of his own making), may recover delay damages under the Miller Act, but such damages are limited to actual out-of-pocket expenditures.  Lighting & Power Servs., Inc. v. Roberts, 354 F.3d 817, 821 (8th Cir. 2004); Consol. Elec. & Mech., Inc., 167 F.3d at 435.  This is true even if the general contractor is not at fault in causing the delays.  Lighting & Power Servs., Inc., 354 F.3d at 821.  "The Miller Act favors allowing full recovery from a general contractor *regardless of fault* because general contractors have privity of contract with the government and can thus recover delay damages directly from the government, while subcontractors cannot."  Id. (quoting Consol. Elec. & Mech., Inc., 167 F.3d at 434-35 (citations omitted and emphasis added by the Roberts court)).

The total cost method can be used to calculate damages under the Miller

Act. Id. The total cost method requires proof that:

> (1) the nature of the particular losses make it impossible or highly
> impracticable to determine them with a reasonable degree of accuracy; (2)
> the plaintiff's bid or estimate was realistic; (3) its actual costs were
> reasonable; and (4) it was not responsible for the added expenses.

Id.

In United States ex rel. Yonker Const. Co. v. Western Contracting Corp., 935

F.2d 936, 938 (8th Cir. 1991), Western was the general contractor on a federal

canal project. It subcontracted part of the work to Yonker, but agreed to perform

certain actions that Yonker relied upon in making its bid. Id. Western agreed to

deliver reinforcing steel ("resteel"), already fabricated, sorted, and tagged according

to contract specifications. Id. It also agreed to perform excavating work; to

provide certain materials, equipment and survey information; and access to work

sites. Id. Yonker brought a Miller Act claim alleging Western breached its contract

by failing to perform timely excavation work, failing to deliver resteel according to

specifications, not sorting and tagging the resteel, and not providing access to the

job site. Id. Yonker alleged these breaches caused delay damages and, when it

requested time extensions, Western refused, causing Yonker to accelerate work

and incur additional damages. Id.

Attorney's fees are generally not available under the Miller Act unless there

is proof that the defendant acted in bad faith, vexatiously, wantonly or for

oppressive reasons. Id. at 942 (citing F.D. Rich, Inc., 417 U.S. at 129). If a

plaintiff asserts both a Miller Act claim and a state law breach of contract claim,

attorney's fees and/or prejudgment interest may be awarded on the state claim if

such remedies are available under state law. United States ex rel. Triple S Alarm

Co., Inc. v. Westfield Ins. Co., 2012 WL 12902491 at *2-3 (E.D. Ark. Aug. 13, 2012); United States ex rel. Cal's A/C & Elec. v. Famous Const. Corp., 220 F.3d 326, 327-28 (5th Cir. 2000).

Here, Hydro is a subsubcontractor (sometimes also called a "second tier subcontractor"), which has no contractual relationship with Morris, the general contractor. Therefore, the remedies against the various parties are distinct. As against Morris and its surety, Hydro's exclusive remedies are under the Miller Act or, as to Morris, *quantum meruit*. Hydro cannot sue Morris or its surety under a contract theory because there was no privity of contract between them. As against Red Wilk, which is neither the general contractor nor the surety, Hydro has no Miller Act claim or remedies. Also, as the district judge previously ruled, Hydro has no claim for *quantum meruit* against Red Wilk. As against Red Wilk, then, Hydro's remedies are determined by South Dakota state contract law.

There are factual scenarios where the state law remedies and Miller Act remedies overlap, as where the plaintiff is a subcontractor with a direct contractual relationship with the general contractor. In such a situation, the plaintiff could assert a Miller Act claim and a state law contract claim against the same defendant-general contractor. Different remedies would be available for each claim, giving rise to the possibility of confusion with the jury. That is not an issue here as there are distinct claims and remedies against Morris and its surety as compared to Red Wilk. The court is confident that the jury in this case will be able to sort out the various claims and remedies as to the various parties.

Finally, Morris argues that, although Hydro has shown it contributed labor and materials to the Fort Randall Dam project, it cannot show it is entitled to

payment.  This is because, according to Morris, Hydro cannot show that its Miller Act claim for payment exceeds Morris' recoupment claim.  Morris itself acknowledges the uncertain nature of a claim in recoupment—whether it is an affirmative defense that must be raised or is waived, or whether it simply negates an element of the plaintiff's *prima facie* case.  <u>See</u> Docket No. 232 at 3 n.3.

The Eighth Circuit has held that "recoupment is a defensive action that operates to diminish the plaintiff's recovery rather than to assert affirmative relief." <u>Rosebud Sioux Tribe v. Val-U Const. Co. of South Dakota, Inc.</u>, 50 F.3d 560, 562 (8th Cir. 1995).  Furthermore the First Circuit has held that recoupment "is a reduction or rebate by the defendant of part of the plaintiff's claim because of a right in the defendant arising out of the same transaction."  <u>United Structures of Amer., Inc. v. G.R.G. Eng'g., S.E. and New Hampshire Ins. Co.</u>, 9 F.3d 996, 998 (1st Cir. 1993).  Recoupment ensures that the judgment "does justice in view of the one transaction as a whole."  <u>Id.</u> at 999.  <u>See also</u>, <u>United States ex rel. Butler Supply, Inc. v. Power & Data, LLC</u>, 2014 WL 7271986 at *2 (E.D. Mo. Dec. 18, 2014); <u>United States ex rel. Tennessee Valley Marble Holding Co. v. Grunley Constr.</u>, 433 F. Supp. 2d 104, 116 (D.D.C. 2006).  Since recoupment only serves to diminish the plaintiff's recovery, it does not negate an element of Hydro's *prima facie* case.

Here, Morris itself acknowledges that Hydro was never paid for 100% of the work it did on the project within 90 days of submitting its invoices for that work.  Furthermore, Morris does not quantify the amount of its recoupment and, even if it did, Hydro's damages are themselves disputed and will be decided at trial.  Hydro has shown all the undisputed facts necessary to prove up a Miller Act claim.

Partial summary judgment as to liability on Hydro's Miller Act claim will be granted. Whether Hydro's Miller Act damages exceed Morris' recoupment is a matter for trial.

**2.      Whether Red Wilk's Liquidated Damages Are Enforceable**

**a.      Validity of Liquidated Damages as a Matter of Law**

Hydro argues that the liquidated damages clause in its contract with Red Wilk is void as a matter of law because it constitutes an unlawful forfeiture or penalty. The contract provides in pertinent part as follows:

> **§ 9 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION**
>
> ------
>
> § 9.7  The liquidated damages for this project are assessed upon late completion and idle time shall not count as working days will be, *$3,500 per Day for the first 10 days-$10,000/ day for each day after initial 10 days,* as set by Contractor to Subcontractor separately in this agreement and which are independent from liquidated damages set by the Prime Contract and/or the Contractor's relationship to Owner. *300 GALLONS PROVIDED AT ALL TIMES H2O Providing: 2 PHASES MAX OF CONTINUOUS CUTTING. CONSTANT CLEAN UP AT ROBOT TO MONITOR CUT.*
>
> Additionally, liquidated damages assessed by Owner to Contractor shall be additional liquidated damages to Subcontractor for any portion thereof related to or caused by Subcontractor's work and/or action and/or caused delays, etc. Damages will be assessed per delinquent task and not as overall progress. Meaning if the subcontractor fails to meet the deadline on a singular task yet meets the overall schedule the Subcontractor will still be responsible for amount of time delinquent on that single task. (Also see § 3.3.1.) *Delay charges in effect.*[6]

See Docket No. 158-1 at p. 16.

The handwritten insertions to § 9.7 of the contract were initialed by both parties' representatives and the word "OK" was handwritten off to the left margin.

---

[6] The typeface which differs from that used in the rest of this opinion signifies the parties' handwritten insertions into the contract.

Id. Section 9.7 refers to section "3.3.1," however there is no such section in the contract. The contract contains a section 3.1, a section 3.1.1, a section 3.3, and a section 3.3.2, but there is no section "3.3.1."

South Dakota has a statute addressing liquidated damages:

Every contract in which an amount of damage or compensation for breach of an obligation is determined in anticipation thereof is void to that extent except the parties may agree therein upon an amount presumed to be the damage for breach in cases where it would be impracticable or extremely difficult to fix actual damage.

See SDCL § 53-9-5.

There is a long line of South Dakota Supreme Court cases interpreting this statute. In 1899, the court refused to enforce a provision in a contract for the purchase of real estate over a five-year period that purported to allow the seller to keep all payments made by the purchaser as damages, plus proceeds from any crops on the land, should the seller breach the contract at any point. See Barnes v. Clement, 12 S.D. 270, 81 N.W. 301, 301 (1899). The only breach of contract committed by the purchaser was that, after making the first two annual payments on time, he was unable to make the third payment. Id. at 301-02. Approximately one month later, the purchaser was able to make the third installment and offered to do so, but the seller refused to accept the money. Id. The only damage to the seller was the loss of the use of the land for the three-year period during which the purchaser occupied the land, a loss that was easy to calculate. Id.

The seller sought to enforce the stipulated damages provision in the contract, noting that it had been expressly negotiated and agreed to by both parties. Id. at 302. The court rejected this argument, stating that "[p]enalties and forfeitures are not favored by courts of equity, and, whenever they can find

reasonable ground for holding that the provisions of a contract for 'stipulated damages' are in the nature of a penalty or forfeiture, they have not hesitated to relieve the party in default from such penalty or forfeiture;" subject to the nonbreaching party's actual damages.  Id.  The court noted that forfeitures "have always been considered as odious in the law" and would not be enforced when compensation for actual harm can be made.  Id. at 303.

One year later, the court again refused to enforce a stipulated damages provision.  Olaf Seim agreed to build a house for Charles Krause, originally for $2,298, but thereafter Charles requested certain changes.   Seim v. Krause, 13 S.D. 530, 83 N.W. 583, 583 (1900).  Charles paid Olaf $1,000, but refused to pay the remaining balance due, alleging Olaf had breached the contract in several particulars.  Id.  The contract provided for stipulated damages if Olaf did not complete the house on time.  Citing the statute, Olaf argued this provision in the contract was an unenforceable forfeiture.  Id. at 584-85.  The court agreed.  Id. The house was an ordinary two-story dwelling and Olaf's failure to complete the house on time—absent any special circumstances--would have caused Charles readily-assessable damages in the form of loss of use, which could be measured by the reasonable rental value of the house for the delay period.  Id.

In Smith v. Detroit & D. Gold Min. Co., 17 S.D. 413, 97 N.W. 17, 18 (1903), the parties entered into a contract whereby the owner of land in the Black Hills agreed, in return for specified payments, to allow a third party to prospect on his property, with certain actions to take place if gold was discovered.  At the time of entering the contract, both parties knew that a portion of the owner's title to the land was in dispute and the contract contained a provision for how that would

affect the parties' rights and obligations under the contract should the title be decided adversely to the owner.  Id.  The prospector thereafter sunk two mining shafts and explored extensively, to no avail:  no gold was discovered.  Id.

Thereafter, the prospector withdrew from the property and sought to rescind the contract on the grounds that the owner had misled the prospector about the owner's good title to all the land.  Id.  The contract contained a liquidated damages clause in the event of a breach of contract by the prospector.  Id.  The court brushed aside the claim of misrepresentation because the terms of the contract clearly showed both parties were aware of the adverse title claim at the time they entered into the contract.  Id. at 18-19.

The court also enforced the liquidated damages clause.  Id. at 19.  The prospector tried to characterize the two mining shafts as "improvements" to the land, but court rejected the contention that holes in the earth were "improvements."  Id. Furthermore, the damage to the owner consisted of not only having two new holes in his land, but also in having the potential of his land to produce gold disproved, an intangible damage that the parties could not ascertain without extreme difficulty, since the value of unproved lodes are speculative in the extreme.  Id.  Because the parties could not easily value this damage caused by having an unproved potential source of gold definitively *dis*proved, it was proper and lawful for them to affix a liquidated damages figure to that detriment.  Id.

In Utley v. Dunning, 38 S.D. 447, 161 N.W. 813, 813-14 (1917), the parties entered into a contract for the sale of a business, including the merchandise and good will of that business.  Each of the parties had deposited $1,000 with a bank, with the entire $2,000 to be forfeited to the other party if one party breached the

agreement.  Id. at 814.  The seller breached the contract and the buyer introduced

no evidence of actual damages but requested solely the $2,000 in liquidated

damages held by the bank.  Id.

Here, the court noted that the damages for either party were easily

ascertained.  Id.  If the buyer refused to buy, the seller could be compensated by

paying him the cost of the appraisal (which set the purchase price) and the

difference between the purchase price and the actual value of the business.  Id.

Likewise, if the seller breached, as here, the buyer could be compensated for the

loss of the use of his purchase money for a set period of time—a concept called

"interest."  Id.  Further evidence that the liquidated damages were intended to be

an unlawful penalty was the fact that the damages amount were the same

regardless of who breached the contract and the damages were the same for a

wholesale failure to perform under the contract as well as for a mere delay in

performance under the contract.  Id.  This, the court held, was clear evidence of a

forfeiture rather than a permissible liquidated damages provision.  Id.  The court

therefore refused to enforce the provision.  Id.  An identical contract provision was

struck down in Harden v. Richards, 41 S.D. 415, 171 N.W. 89 (1919) (parties were

to exchange land and either party would be paid $1,000 in the event of a breach

by the other).

In Russell Miller Milling Co. v. McLean, 48 S.D. 198, 203 N.W. 498, 499

(1925), the seller agreed to sell buyer 400 barrels of flour for $11.36 a barrel, to be

delivered within 60 days.  In the event the buyer breached the contract, the

contract stipulated that buyer would pay seller 25¢ per barrel plus or minus the

market price difference between the date of contract and the date of cancellation.

Id.  Buyer breached the contract and the seller was awarded damages based on the market price differential, but the seller was not awarded the 25¢ per barrel amount.  Id.  On appeal, the court affirmed the judgment, noting that the 25¢-per-barrel amount was clearly a penalty and void under South Dakota's liquidated damages statute.  Id. at 499, 501.  However, that penalty was separable from the other damages provision of the contract, so the market-price-differential provision was valid and enforceable.  Id.

Thirty-eight years later the South Dakota Supreme Court addressed a liquidated damages clause in Anderson v. Cactus Heights Country Club, 80 S.D. 417, 125 N.W.2d 491 (1963).  In that case, the plaintiff was hired under a 10-year contract to design, build, superintend, and maintain an 18-hole golf course for the defendant country club, during which time plaintiff could be discharged only for good cause.  Id. at 492-93.  If defendant breached the agreement, the contract provided for liquidated damages to be paid to the plaintiff in graduated amounts depending on how many years of the 10-year contract had elapsed before the breach.  Id. at 492.

The court stated contractual parties may agree to the amount of money to be paid in the event of a breach if that amount approximates fair compensation for the damage occasioned by the breach and not a penalty.  Id. at 493.  Because of the South Dakota statute, liquidated damages provisions are void unless they come within the exception spelled out by statute:  damages are impracticable or extremely difficult to fix.  Id.  Liquidated damages provisions will be upheld if it appears at the time of contracting the damages in the event of a breach are incapable or very difficult to accurately estimate, there was a reasonable endeavor

by the parties to fix fair compensation, and the amount bears a reasonable resemblance to probable damages and is not disproportionate to anticipated damages. Id. Here, because the contract was for personal services of a golf course designer, damages were difficult to estimate or prove at the time the contract was entered into. Id. Also, the provision was saved from being construed as a penalty because the amount of liquidated damages gradually went down over time as a greater portion of the contract was served. Id. This showed the parties were trying to fix fair compensation for a breach rather than impose a penalty. Id. at 493-94. The court upheld the provision as lawful. Id. at 494.

In a prominent case which signaled a sea-change in the law, the South Dakota Supreme Court upheld a liquidated damages clause in a construction contract with the state of South Dakota for paving a public highway. See Dave Gustafson & Co. v. South Dakota, 83 S.D. 160, 156 N.W.2d 185, 189 (1968). In that case, the contract provided time was of the essence and failure by the contractor to complete the work by the stipulated date resulted in daily liquidated damages. Id. at 186-87. The amount of liquidated damages was fixed in tandem with the overall amount of the contract, so that small projects had small liquidated damages amounts and large projects of over $2 million had liquidated damages of $420 per day for each day beyond the completion date. Id. at 187.

The court suggested that the earlier presumption against liquidated damages provisions expressed in Barnes had been replaced with a more "modern" view, evidenced by the Cactus Heights decision, that liquidated damages provisions should not be viewed with disfavor. Id. at 187-88. The court stated liquidated damages provisions are often particularly useful in government

31

contracts where the delay in use of, for example, a highway, by the public is difficult to project and measure. Id. at 188. Here, the court sustained the provision because (1) delayed use of the highway by the public was "impossible" to measure; (2) the fact that the amounts of liquidated damages were graduated according to the size of the project indicated an attempt by the parties to fix fair compensation of the loss caused by the delay; and (3) the stipulated amount bore a reasonable relation to probable damages and was not disproportionate to damages reasonably anticipated. Id. at 189. The Gustafson decision expressly overruled earlier holdings that (1) liquidated damages would not be enforced if the delay was not the fault of the party breaching the contract; (2) stipulated damages are to be measured by the relation they bear to actual loss incurred and are not enforceable above the actual loss. Walter Motor Truck Co. v. South Dakota Dept. of Transportation, 292 N.W.2d 321, 323 (S.D. 1980) (discussing the holding of Gustafson).

    If a stipulated damages provision is upheld as lawful liquidated damages and not a forfeiture, then the nonbreaching party is entitled to that amount only, neither more nor less, even if actual damages are greater or lesser than the stipulated sum. Dave Gustafson & Co., 156 N.W.2d at 187. Evidence of actual damages is irrelevant and immaterial. Id. In another construction contract case, the court clarified that where it is the *owner* who terminates the contract, the owner may recover the cost of completing the construction contract, but it may not recover liquidated damages. See Subsurfco, Inc. v. B-Y Water Dist., 337 N.W.2d 448, 457-58 (S.D. 1983).

In Walter Motor Truck Co., the court outlined some rules of construction. The language the parties use to describe the stipulated damages is entitled to some weight, but is not controlling. Walter Motor Truck Co., 292 N.W.2d at 323. The language of the parties must be accepted until it is shown that the provision is a penalty. Id. Furthermore, liquidated damages provisions are not to be viewed with disfavor and they are not against public policy. Id. Finally, they are useful in public contracts where the damages are uncertain or unmeasurable. Id. The validity of the liquidated damages clause is a question of law for the court to determine. Id. at 323-24.

The contract in Walter was for the supply of fire trucks at numerous South Dakota commercial airports due to a new Federal Aviation Administration ("FAA") rule requiring such fire-suppression measures. Id. at 322. At the time of contracting, the FAA had granted limited waivers for compliance with the rule, but it was unknown whether the FAA would continue to grant further waivers. Id. at 322-23. Damage due to delay could include each city having to supply municipal fire trucks at the airport for each takeoff and landing of each airplane, as well as the possibility of some accident or catastrophe occurring. Id. 322-24. Given these potential losses, and the difficulty of predicting the amount of loss in advance, the court upheld the $50 per day, per truck, liquidated damages provision. Id. at 324. Further, the parties' negotiations indicated they undertook to fix a fair compensation in light of the contingencies should the FAA refuse to grant further waivers. Id. The court upheld the provision stating the damages were not so disproportionate to the amount of any damage reasonably contemplated at the time of contracting so as to be oppressive. Id.

In <u>Prentice v. Classen</u>, 355 N.W.2d 352 (S.D. 1984), the court distilled the

modern take on liquidated damages clauses:

> The modern tendency, reflected in public contract cases, is not to look
> with disfavor upon liquidated damages provisions in contracts.
> Whether a stipulated sum is an unenforceable penalty or an
> enforceable liquidated damages provision is a question of law for the
> court to determine based upon a consideration of the instrument as a
> whole, the situation of the parties, the subject matter of the contract,
> the circumstances surrounding its execution, and other factors.
> Ordinarily a provision for payment of a stipulated sum for liquidated
> damages will be sustained if (1) at the time the contract was made the
> damages in the event of breach were incapable or very difficult of
> accurate estimation, (2) there was a reasonable endeavor by the
> parties to fix fair compensation, and (3) the amount stipulated bears a
> reasonable relation to probable damages and is not disproportionate
> to any damages reasonably to be anticipated. . . . [The party seeking
> to invalidate liquidated damages bears] the burden of establishing
> that the liquidated damages clause constituted a penalty.

<u>Prentice</u>, 355 N.W.2d at 355 (citations omitted).

The <u>Prentice</u> court upheld a liquidated damages clause in a contract for

deed among private parties whereby the balance due under the contract was

accelerated upon the buyer's default and, upon the buyer's failure to pay the

remaining balance due, the buyer forfeited all payments made under the contract

as stipulated damages. <u>Id.</u> at 355-56. In reaching its holding, the court noted

that the sellers reduced the downpayment required at the inception of the contract

and gave buyers a favorable interest rate. <u>Id.</u> at 355. Although the buyers had

made improvements to the property during their three-year occupancy, they also

had the use of the property, including the residence. <u>Id.</u> The loss of rents and

other detriment to the sellers was not disproportionate to the amount of stipulated

damages. <u>Id.</u> Furthermore, the court noted that the trial court retained the

equitable power to adjust the rights of the parties to the contract, but had not

found facts justifying such adjustment. <u>Id.</u>

Just a few years later, the court again upheld a liquidated damages clause in a contract for deed for a ranch where both parties were represented by lawyers in the contract negotiations, the buyers had sought and received several changes to the proposed contract before it was finalized, the parties had used reasonable efforts to estimate damages in advance but were unable to predict possible losses from overgrazing, other waste, possible damage to the property, future market value of the property, projected rental value of the ranch, or potential loss of royalty income from mineral development.  Heikkila v. Carver, 378 N.W.2d 214, 216-17 (S.D. 1985).

Despite finding the parties were evenly matched, no overreaching occurred, and the contract was arrived at through arms-length bargaining, the court stated the clause could be invalidated if the buyer should show "by clear evidence that a substantial disparity exists between the payments made on the contract, together with the improvements made to the property, and the loss of rents and other detriment suffered by the vendors due to the loss of use and possession of the property." Id. at 217.  In making this statement, the Heikkila court cited to Prentice and to SDCL § 21-50-2, a now-repealed statute that used to allow for equitable adjustment between the parties in the case of real estate foreclosures. Id. The liquidated damages were not disproportionate to the sellers' actual damages, so the clause was upheld. Id. at 218.  See also Overholt Crop Ins. v. Travis, 941 F.2d 1361, 1369-70 (8th Cir. 1991) (applying South Dakota law to uphold a liquidated damages clause in an insurance agent's employment contract).

In Safari, Inc. v. Verdoorn, 446 N.W.2d 44, 44-45 (S.D. 1989), the court invalidated a liquidated damages provision in the sale of a bar.  The parties had

each been advised by lawyers before entering into the contract, but the liquidated damages provision called for buyers to forfeit their $50,000 downpayment and all interim payments made until the breach occurred.  <u>Id.</u>  The buyers possessed the bar and ran it for only three months, after which they were unable to make payments and voluntarily relinquished the business back to the sellers.  <u>Id.</u>  The trial court found the sellers had $30,168.32 in actual damages; it invalidated the liquidated damages provision as an unlawful penalty and ordered sellers to pay buyers $21,831.68, which represented the balance of payments (including the downpayment) the buyers had made over the short term of the contract, less the sellers' damages.  <u>Id.</u>  The Supreme Court affirmed.  <u>Id.</u> at 45-46.

In <u>BankWest, N.A. v. Groseclose</u>, 535 N.W.2d 860, 863-64 (S.D. 1995), in an opinion written by then-Justice Amundson, the court appeared to harken back to the earlier standards announced in <u>Barnes</u>, <u>Seim</u>, and <u>Utley</u> by stating "the law abhors a forfeiture.  Forfeitures are considered as odious in the law, and are not favored by the courts.  Courts of equity will seize upon slight circumstances to relieve a party therefrom."  <u>Id.</u> at 864 (citation omitted).  Compare this statement in the <u>Groseclose</u> decision with the following from <u>Gustafson</u>:  "[The <u>Cactus Heights</u>] case reflects the modern tendency not to 'look with disfavor upon "liquidated damages" provisions in contracts.  When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced. . . They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts.' "  <u>Dave Gustafson & Co.</u>, 156 N.W.2d at 188.  <u>See</u>

also Prentice, 355 N.W.2d at 355 (stating "[t]he modern tendency . . . is not to look with disfavor upon liquidated damages provisions in contracts.").

The Groseclose court then *reversed* the burden of proof established in numerous cases by saying: "The burden of proving that a forfeiture clause is valid as a liquidated damages clause is upon the party relying on the clause." Id. (citing a *North* Dakota case, Hofer v. W.M. Scott Livestock Co., 201 N.W.2d 410 (N.D. 1972)). This, of course, is the opposite of what the court had said in earlier cases—that a liquidated damages clause would be upheld unless the party *against whom* it was being enforced was able to show it was an unlawful forfeiture. See, e.g., Safari, Inc., 446 N.W.2d at 46 (stating "[t]he burden of establishing that such a provision is a penalty rests on the party against whom enforcement is sought."); Heikkila, 378 N.W.2d at 216 (stating "[t]he burden of establishing that the liquidated damages provision is an unlawful penalty rests with the party against whom enforcement is sought."); Prentice, 355 N.W.2d at 355 (stating "Mrs. Classen [against whom the liquidated damages clause was asserted] bore the burden of establishing that the liquidated damages clause constituted a penalty."); Walter Motor Truck Co., 292 N.W.2d at 323 (stating a liquidated damages clause must be accepted as valid "unless it is shown that the provision is for a penalty.").

The facts of the Groseclose case were somewhat unusual. Groseclose sold agricultural land on a contract for deed. Groseclose, 535 N.W.2d at 862. The buyers[7] breached the agreement after making payments for 12 years when they failed to pay real estate taxes when due. Id. The seller immediately paid the taxes

---

[7] The original buyers had to assign some of their interests in the land to assignees in order to satisfy other obligations. Groseclose, 535 N.W.2d at 862. The court refers to all of these parties collectively as "buyers."

herself and sought to retake the land.  Id.  The buyer offered to pay the taxes the next day to cure the default, but the seller refused to accept the payment.  Id. Buyers then tendered the full outstanding accelerated balance due and owing on the contract; the seller again refused to accept the payment.  Id.

The contract for deed contained a provision that, upon default by the buyers, all right, title and interest in the land reverted fully to the seller and the buyers forfeited all previous payments made on the contract along with any right, title and interest in and to all improvements on the land.  Id. at 864-65.  The court noted that the seller did not argue or present any evidence that the forfeiture clause was in reality a lawful liquidated damages clause; accordingly, the court ruled against the seller because she failed to carry "her burden" to prove the provision was valid.  Id. at 865.

The Groseclose case stands as an anomaly.  Its language is clearly at odds with the holdings of every case decided on liquidated damages since Cactus Heights was decided in 1963.  However, if one looks past the language of the decision and applies the proper test as set forth in Prentice, Safari, Inc. and other modern South Dakota cases, it is clear the same result would have been obtained had the Groseclose court applied the test and burdens announced in those more modern cases.  The Groseclose contract provision was clearly a forfeiture:  it was not graduated in any way to take into account the shifting equities between the parties as the buyers paid more and more years on the contract.  Id. at 864-65. The contract also contained no requirement that the seller give notice of default and time to cure the default before the forfeiture provision went into effect.  Id.

Even under the progeny of the <u>Cactus Heights</u> and <u>Dave Gustafson & Co.</u> cases, the provision in the <u>Groseclose</u> contract would have been invalidated.

Applying this body of law to the liquidated damages clause in § 9.7 of the contract between Hydro and Red Wilk, the court concludes it is valid and is not an unlawful forfeiture. First, this was a public contract which, as the <u>Dave Gustafson & Co.</u> court noted, means any harm for late completion is suffered by the public and is particularly difficult to measure or quantify. <u>Dave Gustafson & Co.</u>, 156 N.W.2d at 188. The work on the Fort Randall Dam was being occasioned, in part, by a catastrophic flood that had occurred in 2011. Such a flood could have recurred at any time during construction, with results equally or more catastrophic than the original event.

In addition, hydrodemolition is a highly specialized service which requires the use of highly specialized, expensive equipment which is difficult and expensive to move. At the time of negotiating this contract, both Hydro and Red Wilk knew that if Hydro breached the agreement, it would be difficult if not impossible to get a replacement hydrodemolition company on site and working within a short period of time. Red Wilk characterizes Hydro's role in the project as "critical." Furthermore, Red Wilk argues that *when* a Hydro breach occurred would affect Red Wilk's damages—breaches near the beginning of the project would be more costly than breaches at the end. Red Wilk's damages in the event of a Hydro breach would also include the presence of Red Wilk's crew at the job site, the presence of ProAct[8] on the job site, as well as the presence of various rental

---

[8] The parties state ProAct was a water supplier and water treatment subcontractor. From this description, the court infers that ProAct was the party responsible for providing the 300 gallons per minute of water for Hydro's hydrodemolition and

agreements tied to Hydro's performance.  Red Wilk considered all these factors

before arriving at the liquidated damages figure.  See Docket No. 197-8 at p.5.

Hydro concedes that the daily cost of having ProAct alone at the construction site

was $3,000 per day.  At the time the contract was made, then, damages for breach

by Hydro were difficult to accurately estimate.

There is no evidence from either Red Wilk or Hydro that the parties

discussed § 9.7 from the contract face-to-face.  However, both parties are

sophisticated businesses which are used to negotiating construction contracts.

The handwritten insertions to the liquidated damages clause indicate that Hydro's

representative read the provision, understood the provision, and suggested

changes to the contract because he was concerned about the provision.

Specifically, Hydro conditioned Red Wilk's entitlement to liquidated damages on

Red Wilk satisfying three obligations:  (1) providing Hydro 300 gallons of water at

all times; (2) organizing the hydrodemolition so that Hydro could perform its work

in two phases maximum of continuous cutting; and (3) providing constant clean

up at the robot to monitor the cut.  See Docket No. 158-1 at p. 16.  Those changes,

conditioning Red Wilk's entitlement to liquidated damages, were accepted by Red

Wilk, as evidenced by the initialing of the changes by Red Wilk's owner.  Id.  This

satisfies the requirement that the parties make reasonable efforts to fix fair

compensation.

Hydro argues the provision is clearly an unlawful forfeiture because it

applies to individual tasks, not days of delay.  As discussed more fully below at

section D.1 of this opinion, this contract began its life in its initial iteration as a

---

that ProAct was responsible for capturing and treating the wastewater created by
the hydrodemolition process.

form contract.  As such, it retained many artifacts that were irrelevant, inapplicable or contradictory to the relationship between Hydro and Red Wilk.  The tasks/days distinction is one of these.  Hydro was hired to do one thing: hydrodemolish concrete.  Hydro did not even provide its own support services under the terms of the contract.  Therefore, the tasks/days distinction is inapplicable to the Red Wilk-Hydro contract because the only "task" Hydro was hired to perform was hydrodemolition.  Therefore, the task/days distinction does not render the liquidated damages provision void as a matter of law in this context.

The final requirement is that the liquidated damages not be disproportionate to any actual damages.  Both Red Wilk and Morris were subject to liquidated damages in their respective contracts moving up the chain of command to the Corps if they were late in their work.  This would constitute part of Red Wilk's actual damages.  In addition, Red Wilk itself was obligated under §§ 8, 9.7 and 10.3 of the contract to pay Hydro liquidated damages if Red Wilk was responsible for delay or idle time, another recognition of the invaluable time-is-money nature of the specialized hydrodemolition business, a sword that cuts both ways should either party breach.

The amount of the liquidated damages in favor of Red Wilk was far greater than the amount of liquidated damages specified in the contract between Morris and the Corps, and between Morris and Red Wilk.[9]  However, this alone does not

---

[9] The general contract between Morris and the Corps provided for liquidated damages of $850 per day for every day the project went over the completion date.  See Docket No. 49-1 at p. 16.  The subcontract between Morris and Red Wilk essentially incorporated the liquidated damages from the general contract in that it required Red Wilk to reimburse Morris for any liquidated damages assessed against Morris because of Red Wilk's failure to perform work or supply materials on time.  See Docket No. 149-2 at p. 6.

demonstrate the provision is a forfeiture. In addition to having to pay liquidated damages to Morris if Red Wilk did not finish its work on time due to a Hydro breach of contract, Red Wilk would have additional damages in the form of payments to ProAct, and Red Wilk's own crew and equipment would stand idle while Red Wilk sought and found another hydrodemolition expert, as well as the expense associated with hiring another such expert to come to the dam and work. Red Wilk has placed testimony in the record that its actual damages were $17,000 per day. Although actual damages are irrelevant to the question of the validity of liquidated damages, it does serve to show that the liquidated damages the parties agreed upon are not completely out of touch with reality.

The court concludes that the liquidated damages clause of § 9.7 of the contract between Red Wilk and Hydro is valid under South Dakota law, regardless of whether the burden is on Hydro to prove it was an invalid forfeiture or whether it was Red Wilk's burden to show the provision was valid under SDCL § 53-9-5. That does not mean Red Wilk is automatically entitled to liquidated damages. As can be seen from the text of § 9.7 itself, Red Wilk's entitlement to liquidated damages is conditioned on its own performance in supplying adequate water, adequate clean up, and two phases of continuous cutting. Whether Red Wilk satisfied these preconditions is disputed. Therefore, this opinion does *not* represent the court's conclusion that liquidated damages should be awarded to Red Wilk. That will be determined by the jury at trial.

### b. Waiver of Liquidated Damages

Hydro also argues that Red Wilk has waived its right to liquidated damages since it was Red Wilk's own actions that prevented Hydro from timely performing

42

its contractual obligations. Waiver applies "where one in possession of any right, whether conferred by law or by contract, and with full knowledge of the material facts, does or forebears the doing of something inconsistent with the exercise of the right." Subsurfco, Inc., 337 N.W.2d at 455. To demonstrate waiver, "there must be a showing of a clear, unequivocal and decisive act or acts showing an intention to relinquish the existing right." Id.

Hydro's waiver argument is based on Hydro's assertion that Red Wilk did not supply water or clean up as required and that Red Wilk did not organize the work into two phases of continuous cutting. As indicated above, that is a contested factual issue. It does not appear as a matter of law that by failing to perform hydrodemolition support work as Hydro expected, Red Wilk clearly, unequivocally, and decisively intended to communicate it was giving up its right to liquidated damages under the contract. The jury will determine this issue as genuine issues of material fact abound.

Hydro's citation to United States ex rel. Gillioz v. John Kerns Constr. Co., 140 F.2d 792 (8th Cir. 1944), does not change this conclusion. In that case, the liquidated damages provision was not conditioned on the performance of prerequisite acts by the recipient of damages as the clause in the Red Wilk-Hydro contract is. See Gillioz, 140 F.2d at 793-94. Furthermore, that contract was for the construction of a dam for the federal government. Id. at 793. Although the contract was to be completed by December, 1940, engineers for the government continued to make changes to the plans and specifications affecting the subcontractor's work until April, 1941, five months *after* the date when the dam was to have been completed. Id. at 794. As the court observed, the subcontractor

was not liable to the general contractor for liquidated damages because the contract could not be read to require the subcontractor to "do the impossible," i.e. construct a dam the plans and specifications for which were not even completed. Id. at 795. The Gillioz decision does not change this court's conclusion that whether Red Wilk was responsible for the delay which ostensibly triggers liquidated damages presents a fact question for the jury.

### 3. Red Wilk's Counterclaim

Hydro argues it is entitled to summary judgment on Red Wilk's counterclaim for four reasons: (1) Red Wilk failed to give notice and an opportunity to cure, (2) Red Wilk caused its own damages, (3) Red Wilk's damages calculation is too speculative, and (4) manholes were not included in the Red Wilk-Hydro contract.

### a. Notice and Opportunity to Cure

In its counterclaim, Red Wilk asserts that Hydro failed to complete its work under the contract in a workmanlike manner in compliance with the specifications of the Corps. Hydro argues that (1) there is a factual dispute about who is to blame for any defective hydrodemolition and (2) Red Wilk cannot assert a claim on the basis of poor work unless it gave Hydro prior written notice of the defective work and an opportunity to cure the defective work.

As to the latter, Red Wilk admits it did not give notice and an opportunity to cure, but alleges it was contractually excused from doing so because Hydro abandoned the work site and made it clear it would not do any more work on the project. The contract states "[i]f the Subcontractor defaults or neglects to carry out the Work in accordance with this Agreement and fails within three working days after written notice from the Contactor to commence and continue correction of

such default, or neglect with diligence and promptness, the Contractor may" fix the problem itself and charge Hydro with the costs of the fix. See Docket No. 158-1 at pp. 4 & 12, §§ 3.4 & 7.2.1; Docket No. 158-2 at pp. 4 & 12, §§ 3.4 & 7.2.1.

Red Wilk alleges early on in the project there was deficient work done by Hydro and it asked Hydro to make another pass over the area to hydrodemolish the concrete to a deeper depth. Red Wilk alleges Hydro refused. There was at least one instance where the Corps specifications required hydrodemolition to either a six or 10-inch depth and Hydro performed that demolition. Examination of the area afterward showed the concrete was "delaminated" to a deeper depth than had been thought before. Hydro's position was that requiring hydrodemolition to a new depth not spelled out in the plans and specifications required a change order. See Docket No. 203-8 at pp. 9-10. However, Red Wilk also argues there was at least one area where Hydro only removed concrete to a depth of one inch, which if true, would not be in conformity with the Corps' plans and specifications.

North Dakota contract law tracks closely with South Dakota contract law. In United States ex rel. Huwe v. Yerba Buena Engineering & Const., Inc., 2016 WL 7507794 at *1 (D.N.D. May 12, 2016), the court applied North Dakota law to a construction contract on a Miller Act project. Specifically, the subcontract between the general contractor, Yerba Buena, and the subcontractor, Huwe, called for Huwe to move nine buildings to a different location. Id. Yerba Buena issued one notice to cure, with which Huwe complied. Id. After completing the work, Huwe submitted a bill for the entire contract price of $152,000. Id. Yerba Buena paid Huwe only $100,000. Id. Thereafter, Huwe brought a Miller Act action

against Yerba Buena and its surety for the remainder of the contract price.  <u>Id.</u>
Yerba Buena asserted a counterclaim, alleging Huwe breached the subcontract by
performing its work defectively.  <u>Id.</u>

The subcontract required Yerba Buena to give notice and an opportunity to
cure to Huwe if Yerba Buena intended to withhold payment on account of defective
work.  <u>Id.</u> at *2-3.  It was undisputed Yerba Buena had not given such notice as to
the claimed defects.  <u>Id.</u>  Yerba Buena's position was that it was not required to
give such notice and opportunity because it would be futile to do so and that the
notice and opportunity to cure section of the subcontract was inapplicable.  <u>Id.</u>

Addressing the latter argument, the court gave effect to the notice and
opportunity to cure provision, noting it was broadly written.  <u>Id.</u> at **3-4. Further,
if the court failed to apply the provision to these facts, the provision would be
rendered essentially meaningless.  <u>Id.</u>  As to the futility argument, the court held
Yerba Buena had failed to submit affidavits containing admissible evidence
sufficient to entitle them to summary judgment.  <u>Id.</u> at **4-5.  For this reason,
summary judgment was denied on Yerba Buena's counterclaim.  <u>Id.</u>

Here, it is clear the notice and opportunity to cure provision in the Hydro-
Red Wilk contract is valid and enforceable.  It is equally clear that Red Wilk failed
to give such notice.  As to whether that precludes Red Wilk from maintaining its
counterclaim for defective work, however, there are genuine issues of material fact.

Red Wilk claims Hydro left the work site without finishing its work.  Hydro
asserts it finished all work to Red Wilk's satisfaction except the manhole work,
over which the parties disagreed.  Hydro also asserts any hydrodemolition that
was deemed not sufficiently deep is Red Wilk's fault because Red Wilk failed to

46

clean continuously at the robot and failed to manage the waste water so as to allow Hydro to ascertain how deep it was cutting and whether further passes over an area were necessary.

Hydro supplied an email from Hydro's Wayne Younger to Red Wilk's Patrick McGinnis dated August 25, 2014, sent at 11:45 a.m. stating that as of 1 p.m. that day, Hydro would be done with all work on the Fort Randall Dam and would start charging Red Wilk idle and delay charges unless Red Wilk advised that there was additional work to be done. See Docket No. 176-10. Red Wilk responded that Hydro had completed all the work it was willing to do except the manhole locations. Id. Red Wilk informed Hydro that it could leave without completing the manholes, but this would not waive Red Wilk's right to assert a later claim for the manhole work. Id.

Hydro also supplied an excerpt from Red Wilk's Federal Rule of Civil Procedure 30(b)(6) deposition wherein Red Wilk acknowledged it knew of defective work by Hydro before Hydro decamped from the job site. See Docket No. 225-2 at p. 3. However, in this deposition, Red Wilk alleged it informed Hydro of the defective work and Hydro refused to cure the defect. Id. Specifically, there was an area near wall E that Hydro had demolished that was demolished to a depth of only approximately one inch. The defect was such that Red Wilk characterized it as "obvious." Red Wilk asserts it told Hydro about this and requested Hydro to cure the defect. Allegedly, Hydro's response was "there are no recuts in our contract"—in other words, Hydro refused to go over the defective area again with its robot and deepen the cut. In support of Red Wilk's position, it is notable that

Hydro never supplied the court with a certificate of substantial completion by Red Wilk.

The court concludes that there is a genuine issue of material fact as to whether Hydro left the work site under circumstances where it would have been futile for Red Wilk to give notice and an opportunity to cure. In the August 25 email, Hydro notified Red Wilk within less than two hours that it would quit the job site or, in the alternative, begin charging $3,000 per day for idle charges. Red Wilk's assent to Hydro leaving under these circumstances can hardly be taken as a representation that Red Wilk believed Hydro had satisfactorily performed all its work.

The same can be said for the deposition passage. If Red Wilk had informed Hydro in the past of defective work and Hydro refused to bring its work into compliance, it may very well have been futile for Red Wilk to give Hydro written notice and an opportunity to cure.

Hydro emphasizes that the contract requires *written* notice and that it is undisputed Red Wilk never gave Hydro *written* notice of defects. That may be true, but parties to a contract through their common practice can modify terms of a contract to excuse written notice for change orders or defects, thus nullifying the requirement that such matters be reduced to writing. See All Star Const. Co., Inc. v. Koehn, 2007 S.D. 111, 741 N.W.2d 736, 744-45. It is unknown whether that happened in this contractual relationship or not. Summary judgment cannot be issued on these facts.

### b. Red Wilk Caused its Own Damages

Hydro argues that Red Wilk's damages were caused by its own conduct in failing to provide Hydro with 300 gallons of water per minute for hydrodemolition, failure to continuously clean up at the robot, and failure to handle the wastewater created by hydrodemolition. These are issues for the jury because genuine issues of material fact exist. In addition, the court notes that Red Wilk's damages also include the manholes, discussed below, as well as work that was left unfinished above tier 46. Neither of these sources of potential damages were the result of Red Wilk's alleged other shortcomings. Partial summary judgment will not issue to Hydro on the basis that Red Wilk caused its own damages.

### c. Whether Red Wilk's Damages are Speculative

Hydro argues that Red Wilk's damages for its counterclaim are too speculative and the court must therefore dismiss the counterclaim. The basis for Hydro's argument is that Red Wilk's expert, Holloway, has not provided any source accounting documents supporting his opinion as to Red Wilk's damages.

First, this assertion appears not to be wholly true. One element of damages Red Wilk is claiming is that Hydro was supposed to hydrodemolish the manholes and refused to do so. In deposition passages submitted to the court on other issues, the court has observed discussion that Red Wilk provided to Hydro in discovery the billings from 2X, who performed this work after Hydro left the job site. Therefore, at least some of the source documents appear to have been provided by Red Wilk.

Also, Red Wilk's counterclaim includes not only the manhole work it claims Hydro left undone, but also other work above tier 46 that was to be completed by

Hydro and never was. Red Wilk claims that, when Hydro returned to the job site on August 11, 2014, after having left on July 29, Red Wilk gave Hydro a list of areas remaining to be hydrodemolished, including this work above tier 46. <u>See</u> Docket No. 197-8 at p. 18. Red Wilk claims Hydro never did this work.

South Dakota contract law requires Red Wilk to prove its damages to a reasonable certainty. <u>Bunkers</u>, 653 N.W.2d at 743; <u>McKie v. Huntley</u>, 2000 SD 160, 620 N.W.2d 599, 603. At trial, Red Wilk will be required to show a reasonable relationship between the method used to calculate its damages and the amount claimed. <u>Id.</u> On the present record, the court cannot conclude that Red Wilk's damages are so speculative that Hydro is entitled to summary judgment on the entirety of Red Wilk's counterclaim. Therefore, Hydro's motion is denied to this extent.

### d. Manholes

Hydro's final argument in support of its motion for partial summary judgment is that manholes were not included in the work of its contract with Red Wilk because they are not separately addressed in the contract. Hydro asserts it discussed manholes explicitly with Red Wilk at a March 25, 2014, meeting before the contract was entered into and Red Wilk told Hydro manholes were *not* included in the contract. <u>See</u> Docket No. 176-3 at p. 9. At a minimum, Hydro asserts there was either a mutual mistake of fact or a failure to reach a meeting of the minds as to manholes.

Red Wilk asserts that hydrodemolition around manholes *was* included in the contract and that it was lumped in with the hydrodemolition work at the 10-inch depth. Red Wilk argues that the Corps' August 30, 2013, amendment to its

plans and specifications make clear that manholes were part of the 10-inch

hydrodemolition work.  Furthermore, Red Wilk asserts that the issue of manholes

and the requirement that they be hydrodemolished to a depth of 10 inches was

specifically discussed with Hydro at the March 25, 2014, meeting.  <u>See</u> Docket No.

197-8 at p. 6.

The final contract between Red Wilk and Hydro contains this pertinent

provision:

**§ 8:   THE WORK OF THIS SUBCONTRACT**
The Subcontractor shall execute the following portion of the Work and
work implied pursuant to [sic] described in the Subcontract
Documents, including all labor materials, equipment services and
other items required to complete such portion of the Work, except to
the extent specifically indicated in the Subcontract Documents to be
the responsibility of others.  *To Supply equipment and labor to perform
hydrodemolition work for Fort Randall Dam Spillway Phase II in
Pickstown, SD*

Hydrodemolition to an average depth of 6" for approximately 40,440
s.f. upstream of tier 46.

Hydrodemolition to an average depth of 6" for approximately
6,935 s.f. downstream of tier 46.

Hydrodemolition to an average depth of 10" for approximately 29,575
s.f. upstream of tier 46.

Hydrodemolition to an average depth of 10" for approximately 10,925
s.f. downstream of tier 46.

**Equipment and Labor Provided by American Hydro:**
One (1) hydrodemolition unit utilizing 6 pumps to accomplish scope of
work listed above.  Shall provide employees properly trained and
competent for their daily duties, all employees shall be required to
wear proper safety equipment at all times.  Daily clean up of
employee's [sic] garbage and debris shall [sic] without additional cost
to contractor.

General shall supply the following

Staging area, within 100' of the project, for hydrodemolition
equipment.

Continuous and uninterrupted water filtered to 5 micron through a 2"
hose, ~~at a minimum rate of 250 gallons per minute up~~ <u>to a rate of up
to 300 gallons per minute delivered to American Hydro's 1,000 gallon
water tank.</u>  *delivered at all times.*

Anchor system to support 7,000 pound robot for all work below tier
46 (downstream).

Protection as required to protect people and property from debris and
water.

Containment and disposal of all water and concrete debris from the
spillway.

Crane and operator for placing up to 40,000 lb. hydrodemolition
equipment into the work area.

Control and treatment of all runoff water from hydrodemolition and
cleanup.

Equipment for moving hydrodemolition system around project site.

Equipment and manpower mobilization to the project site cut only.
$22,000/EA
Idle time and standby charges while on project.  $3,000/day

Idle and standby charges shall not be assessed if site and weather
conditions do not allow work to be completed safely.  Standby and
idle charges will not be assessed if idle time interferes with the critical
timeline tasks and has been scheduled (3) days prior to standby.

<u>See</u> Docket Nos. 158-1 at pp. 13-14; 158-1 at pp. 13-14 (strike-through and

underlining in the original).  The amounts and depths of hydrodemolition in the

contract are repeated in §§ 9.3 and 10.3.  <u>Id.</u> at pp. 15 & 17, §§ 9.3 & 10.3.

Prior to the parties executing the final contract containing the above

provision, Hydro submitted four proposals.  Each of Hydro's proposals included

figures for removal of specified square footage of concrete at the six-inch depth and

removal of specified square footage of concrete at the ten-inch depth.  <u>See</u> Docket

Nos. 159-1, 161-1, 159-2, and 159-3.  Three of the proposals also separately set

forth proposals for hydrodemolition of manholes specifically, or 18-inch demolition specifically, since manholes were originally to be hydrodemolished to a depth of 18 inches.  See Docket Nos. 159-1, 159-2, and 159-3.

The final contract between Hydro and Red Wilk does ***not*** specifically mention hydrodemolition of manholes, nor does it specify any hydrodemolition at a depth of 18 inches.  See Docket No. 158-3.  This is significant.  In the second proposal by Hydro, no manhole work was proposed.  See Docket No. 161-1.  The sequence of dates of the four proposals were, in 2013:  July 29, August 22, and August 30; and in 2014:  April 2.  See, respectively, Docket Nos. 159-1, 161-1, 159-2, & 159-3.  The August 22, 2013, proposal (second chronologically) is the only one that does not include a proposal for manhole work by name or manhole work by reference to hydrodemolition at the depth of 18 inches.  See Docket No. 161-1.

Also, in the prime contract between the Corps and Morris, manhole work is always separately set forth.  See Docket Nos. 156-1 at p.14; 160-2 at p.6; 191-8 at pp. 9, 24, 33, 171-74, 177-78.  The custom or practice between the parties on this project appears to have been to separately delineate the manhole work from other types of concrete demolition.

If Red Wilk and Hydro had agreed that Hydro would perform hydrodemolition of manholes, it seems almost certain that the parties would have separately addressed manhole work in their contract.  As a matter of offer and acceptance, Hydro *offered* to hydrodemolish manholes (as evidenced by three of their proposals), but Red Wilk did *not accept* that part of Hydro's offer.  Even more telling is the fact that the square footage figures for hydrodemolition of concrete at

the six-inch and 10-inch depths in the final Red Wilk-Hydro contract are identical to those same figures in all four of Hydro's proposals. Compare Docket Nos. 158-1 at pp. 13-14, and 158-2 at pp. 13-14; with Docket Nos. 159-1, 160-2, 159-2, and 159-3. This lends credence to Hydro's argument that manholes are not covered by the Red Wilk-Hydro contract. If manhole work was lumped in with Hydro's other 10-inch demolition work, the square footage in Hydro's proposals for 10-inch removal would have increased at some point. That the figure remained static speaks volumes.

The square footage for removal of concrete at the 10-inch depth stayed the same throughout the negotiation of the Red Wilk-Hydro contract and in the final contract itself: 40,500 square feet. If manholes were *added* to the total of 10-inch hydrodemolition in the final contract as Red Wilk asserts, the total square footage for 10-inch concrete removal in the contract would have *increased* from that set forth in the proposals. Instead, the square footage for 10-inch removal by Hydro remained the same in each of Hydro's four proposals and in the final contract. See Docket Nos. 159-1, 158-2 at pp. 13-14, 158-3 at pp. 13-14, and 160-2. In each of these documents hydrodemolition of concrete at the 10-inch depth is 40,500 square feet. No additional square footage was added to the total for 10-inch hydrodemolition to take into account hydrodemolition of manholes at a 10-inch depth.

Red Wilk argues that the Corps amended its contract on August 30, 2013, to allow hydrodemolition of the manholes to a depth of 10 inches and that the 10-inch removal in its final contract with Hydro includes hydrodemolition of

manholes. Hydro alleges it was never advised of, or provided a copy of, the Corps' August 30, 2013, amendment.

However, there is ambiguity which the parties never explain to the court. In the contract between the Corps and Morris, a total of 81,775 square feet of hydrodemolition of concrete is provided for in the following categories: less than 8" upstream, downstream, at the walls, and at the gates; and more than 8" in all the same locations. See Docket No. 160-2 at pp. 4, 7-8. The contract between Morris and Red Wilk tracks the same figures for the same square footage of hydrodemolition at the same locations. See Docket No. 156-2 at p. 10.

The total of hydrodemolition agreed to between Red Wilk and Hydro was 87,875 square feet, all denominated either "upstream" or "downstream," but none of which is separately designated to be at the gates, walls, or manholes. The court is aware from arguments of the parties on other issues that Hydro's work *did* include hydrodemolition at the gates and walls. The hydrodemolition square footage figures from the Corps-Morris and Morris-Red Wilk contracts, no matter how the court combines them, do not reconcile with the square footage figures set forth in the Red Wilk-Hydro contract. [10] The Red Wilk-Hydro contract total square footage is more than that set forth in the other two contracts.

Red Wilk's agent testified *he* came up with the totals for square feet of concrete to be hydrodemolished in the Red Wilk-Hydro contract and that the total

---

[10] For that matter, the parties never explain why both the Corps-Morris contract and the Morris-Red Wilk contract specify less than 8-inch removal and more than 8-inch removal, while the Red Wilk-Hydro contract specifies 6-inch removal and 10-inch removal.

figure was just his "best guess."[11]  See Docket No. 197-8 at p. 7.  It seems to the court a fairly unorthodox business practice to "guess" at the amount of concrete to be hydrodemolished when that amount was rather precisely set forth by the Corps in its plans and specifications.  It is even more unorthodox to set the amount at a figure *higher* than what the Corps—the owner—asked for.  But even if Red Wilk "guessed" at the total square footage of concrete to be demolished, this still begs the question why the total would not have increased when additional work was added to it—i.e. when manholes were supposedly lumped in with 10-inch hydrodemolition.

Further complicating matters is the Corps' August 30, 2013, amendment. The amendment eliminated the requirement of 18-inch hydromilling of manholes and instead specified that the full depth of the concrete around the manholes was to be removed *via sawcut*, not hydrodemolition.  See Docket No. 160-2 at p.1.  The contract between Hydro and Red Wilk does not include any sawcut work.  See Docket Nos. 158-2 & 158-3.  Despite this amendment, the Corps continued to require some hydromilling around the manholes, but did not specify how much. See Docket No. 160-2 at p. 1.  The parties do not specify the square footage associated with hydromilling manholes, either before or after the Corps' August 30, 2013, amendment.

---

[11] Also, Red Wilk asserts the Corps dramatically decreased the scope of what was to be hydrodemolished.  The citation Red Wilk gives in support of this assertion is simply a discussion of manholes in the deposition of William Hach of Hydro.  See Docket No. 197-10 at p.6.  It is undisputed the Corps removed its original requirement to hydrodemolish manholes to a depth of 18 inches.  But other than that, the court has not been directed to any other decreases in the Corps' square feet of concrete to be demolished.

The Corps also issued an amendment on August 27, 2013, in response to a question.  See Docket No. 160-1 at p.1.  Neither party discusses this amendment, but it appears relevant.  The question and its answer were as follows:

> Q1:  There are bid items that are separately identified for VCP drains, types A, B, and C manholes, and frost blanket material replacement.  These activities require hydrodemolition and concrete replacement of the existing slab.  Are the quantities for hydrodemolition and concrete replacement in these areas covered in the bid items for hydrodemolition and concrete replacement, or are they in addition to them, and need to be added to the bid items for VCP drains, types A, B, and C manholes, and frost blanket material replacement?
>
> A1:  Hydrodemolition and concrete replacement shall be included in the bid items for Type A manholes, Type B manholes, and Type C manholes.  Hydrodemolition and concrete replacement will be paid under their respective line items for replacement of the VCP drain and replacement of frost blanket material.

See Docket No. 160-1 at pp. 1-2.

This August 27 amendment raises more questions than it answers.  First, was Hydro aware of this amendment?  Second, the implication of the answer to the question is that if one bids the manhole work, that necessarily includes the hydrodemolition for the manholes.  But one might also read the answer to mean that if one bids the hydrodemolition work, that necessarily includes the hydrodemolition for the manholes.  In other words, the answer is susceptible of more than one interpretation.

Third, this amendment was issued three days *before* the second amendment, discussed above, which did away with the requirement for 18-inch hydromilling of manholes.  If one reads the August 27 amendment to mean that the total square footage of hydrodemolition in the Corps project included hydromilling for manholes, why did the Corps not amend downward the total square footage for hydrodemolition after the August 30 amendment?  If manholes

57

were included in the total hydrodemolition figures pre-amendment, and 18-inch hydrodemolition was eliminated by the amendment, the total hydrodemolition figures should have been less after the August 30 amendment. The court is aware of no such adjustment in the Corps project description after the August 30 amendment.

The parties never explain these several discrepancies. The discrepancies leave open the possibility that Red Wilk is right—that the Red Wilk-Hydro contract lumped manhole work in with the other hydrodemolition. There is also the possibility that Hydro is right—Hydro's proposals and the parties' final contract lend credence to Hydro's argument. Although portions of the parties' depositions have been provided to the court, the court does not have before it the entirety of any of these depositions—so the court is unable to read the parties' descriptions of their understanding of the contract as they entered into it. Accordingly, the court concludes there is a genuine issue of material fact that must be decided by the jury as to whether the Red Wilk-Hydro contract included manhole work. The court denies Hydro's motion for summary judgment on Red Wilk's manhole counterclaim.

**D.    Red Wilk's Motion for Partial Summary Judgment**

Red Wilk argues it is entitled to partial summary judgment against Hydro on two issues. First, Red Wilk argues that Hydro's sole remedy for delay was to seek an extension of time to perform. Since Red Wilk alleges Hydro never asked for an extension of time to perform, Red Wilk argues Hydro is not entitled to any money damages or acceleration costs. Second, Red Wilk argues Hydro's exclusive remedy

for delay caused by Red Wilk is the $3,000 per day specified in the contract.  Red Wilk seeks to preclude any other damages on Hydro's part.

**1.** **Request for Extension of Time**

    **a.** **Section 9.6**

        **i.** **Damages are Not Limited**

The prow of Red Wilk's argument is premised on § 9.6 of the contract.  That section provides generally that scheduling information shall be provided by Red Wilk and Hydro must keep on schedule.  It provides that if Hydro falls behind, the contractor may require Hydro to accelerate work with no additional compensation.  Then the provision contains this passage:  "**No claims for additional compensation or damages for delays, whether caused . . . [by] Contractor, including, but not limited to, conduct amounting to a breach of this Agreement . . . shall be recoverable from Contractor, and a mutually agreed upon extension of time for completion shall be the sole remedy of Subcontractor, . . .**"  Red Wilk argues this provision means that Hydro cannot obtain any damages and its only remedy is to request an extension of time from Red Wilk.  Red Wilk further argues that Hydro did not request an extension of time, so it is not even entitled to that remedy.

If one read § 9.6 in isolation, one might conclude in favor of Red Wilk.  But there is simply no way to read the contract as a whole in this way.  Other provisions in the contract make evident that Hydro has other remedies aside from merely requesting an extension of time.  Section 4.7 of the contract says if Red Wilk fails to pay Hydro within 30 days of when payment was due, Hydro may, "*without prejudice to any other available remedies* and upon fifteen additional days'

written notice to the contractor, stop work . . .until payment . . . has been received." See Docket No. 158-1 at p. 10, § 4.7; Docket No. 158-2 at p. 10, § 4.7 (emphasis added). Section 5.3 also states a subcontractor may make claims to the contractor for additional cost, extensions of time, and "damages for delay *or other causes*." Id. at p. 11, § 5.3 (emphasis added). Section 7.3.1 allows Red Wilk to, without cause, suspend, delay or interrupt Hydro's work. Id. at p.13, § 7.3.1. If Red Wilk does so, Hydro is entitled to "an equitable adjustment of the Subcontract Time *and Subcontract Sum*." Id. (emphasis added).

Most importantly, though, is the fact that Hydro and Red Wilk specifically negotiated and provided for money damages in favor of Hydro if Red Wilk caused idle or standby time. Id. at pp. 13, 16, and 17, §§ 8, 9.7, and 10.3. These provisions simply cannot be squared with the language in § 9.6 that the only remedy for delay is to request an extension of time. This court must read the contract as a whole and give effect to all provisions, if possible. In re Dissolution of Midnight Star, 2006 S.D. 98, ¶ 12, 724 N.W.2d at 337. Barring that, the court must give effect to highly specific provisions over more general provisions. Spiska Eng'g, Inc., 2007 S.D. 31, ¶ 21, 730 N.W.2d at 645. The highly specific provisions detailing Hydro's right to idle and standby money damages, as well as the contract as a whole, dictate that § 9.6 should not be read so as to preclude money damages for Hydro for delay occasioned by Red Wilk.

Red Wilk attempts to split hairs and argue that "delay" as used in § 9.6 is different and distinct from "idle and standby" as used in §§ 8 and 10.3. First, the ordinary meaning of "delay" is "to put off to a later time; defer; postpone," and "to impede the process or progress of; retard; hinder," and "to put off action; linger;

loiter."[12]  The definition of "idle" includes "not working or active; unemployed;

doing nothing; not in use or operation; not kept busy."[13]  "Standby" is similarly

defined as "something or someone held ready," "kept readily available for use," and

"in a state of readiness to act, respond, or be used immediately when needed."[14]  It

is clear the concept of "delay," "idle" and "standby" are all but interchangeable.

Evidence that the parties themselves understood those words to be

interchangeable can be found in the contract.  At § 9.7, the parties hand-wrote off

to the side "delay charges in effect."  <u>See</u> Docket No. 158-1 at p. 16, § 9.7; Docket

No. 158-2 at p. 16, § 9.7.  In §§ 8 and 10.3, the damages are denominated "idle

and standby charges."  <u>Id.</u> at p. 14, § 8; p. 17, § 10.3.  The contract is clearly

referring to the same damages in all three places.  Furthermore, Red Wilk itself

used the term "delay damages" interchangeably with "idle and standby charges."

<u>See</u> Docket No. 203-25, bottom half of document.  The court rejects the argument

that "delay damages" as referenced in § 9.6 are something other than "idle and

standby charges" as referenced in §§ 8 and 10.3.

This contract was originated by Red Wilk, so any ambiguities are interpreted

against Red Wilk.  <u>Ass Kickin Ranch, LLC</u>, 2012 S.D. 73, ¶ 9, 822 N.W.2d at 727.

Furthermore, this contract began as a form contract for private construction

projects on which Red Wilk was the general contractor.  As such, the contract

contains many "artifacts" that should have been stricken by the parties as

irrelevant, inapplicable, or inconsistent.  The parties did not go through the

contract and eliminate all these artifacts.

---

[12] <u>See</u> www.dictionary.com/browse/delay?s=t last checked Aug. 2, 2017.
[13] <u>See</u> www.dictionary.com/browse/idle?s=t last checked August 2, 2017.
[14] <u>See</u> www.dictionary.com/browse/standby?s=t last checked August 2, 2017.

For example, Red Wilk is described as the "Contractor," Morris is described at the "Owner," and Hydro is described as the "Subcontractor." See Docket No. 158-1 at p. 1; Docket No. 158-2 at p. 1. Section 4.5.1 requires the "materials" Hydro provides to be new and of good quality—Hydro was not providing any materials to be installed on this project. Id. at p. 9, § 4.5.1. Sections 9.1 and 9.2 provide that the date of execution of the agreement shall be the commencement date for the work except if Hydro obtains permission to timely file mortgages, mechanic's liens and other security interests. Id. at pp. 14-15, §§ 9.1 & 9.2. Similarly, § 11.7 requires Hydro to execute a lien waiver before receiving each progress payment. Id. at p. 19, § 11.7. As discussed elsewhere in this opinion, no mortgages, mechanic's liens or security interests can be filed against the federal government on a Miller Act project, so these provisions in the contract are irrelevant. The court concludes that the language in § 9.6 purporting to limit Hydro's damages for delay caused by Red Wilk is an artifact from the form contract. The court will not give effect to that provision.

### ii. Hydro Requested an Extension of Time

Even if the court were to hold that § 9.6 limited Hydro in the case of delays to requesting an extension of time, the court finds Hydro did in fact make such a request. The allegation by Red Wilk's counsel that Hydro never requested an extension of time borders on a sanctionable violation of FED. R. CIV. P. 11. Red Wilk's lawyer writes in his brief in opposition to Hydro's motion for summary judgment, that "no request for extension of time for performance was requested." See Red Wilk Brief at Docket No. 192, p. 13. This assertion is belied by the facts.

Hydro sent Red Wilk at letter dated May 15, 2014, in which it stated:  "**Per section 5 of the contract, American Hydro hereby makes a claim for an extension of time, additional cost, delay damages, and idle equipment charges.**"  See Docket No. 203-32 at p. 1.  That Hydro formally and in writing sought an extension of time to perform under the contract—with a specific citation to the applicable contract provision—is indisputable.  Counsel's representation to the contrary does a disservice to the reputation of all lawyers.

Red Wilk also alleges it served Hydro with requests to admit and that Hydro failed to admit or deny those requests within the 30 days allotted by Fed. R. Civ. P. 36.  Accordingly, Red Wilk asks the court to deem those requests admitted.  If they are admitted, then Red Wilk argues this establishes Hydro never asked for an extension of time.  Red Wilk is wrong on so many counts.

First, the court has read the requests to admit.  See Docket No. 167-7. Even if these requests were deemed admitted, they would not extinguish Hydro's acceleration damages.  As explained above, Hydro claims acceleration damages for two events or times:  (1) at the beginning of the contract when Red Wilk demanded Hydro begin work on April 21 and (2) in mid-contract when Red Wilk refused to grant an extension of time and insisted Hydro complete its work by August 1, 2014.  As to the latter, Red Wilk's requests to admit do not affect those claimed acceleration damages at all.  Id.  Request to admit nos. 24 and 25 would affect the former category of acceleration damages if they were deemed admitted.  Id. at p. 4.

Second, the full facts are as follows.  Counsel for Hydro prepared signed answers to the requests to admit and personally placed them in a United States mail receptacle, postage prepaid, addressed to Red Wilk's counsel within the 30

days allotted by Rule 36.  <u>See</u> Docket No. 188.  That document never arrived at Red Wilk's counsel's office.  <u>Id.</u>  When Red Wilk's counsel contacted Hydro's counsel about the responses Red Wilk thought were overdue, counsel for Hydro (1) explained what steps he had taken to timely serve Red Wilk with Hydro's responses and (2) sent duplicate responses.  <u>Id.</u>  Red Wilk's counsel received the replacement document within days of when they would originally have been due in any event.  <u>Id.</u>

Red Wilk's counsel was fully aware of these facts when he made his specious argument that the requests to admit should be deemed admitted. Furthermore, Hydro investigated the matter and found other examples where mail had been placed in the same receptacle and never arrived.  <u>See</u> Docket No. 202. Of course, this "extra mile" by Hydro is not required by the rules.

Rule 5 of the Federal Rules of Civil Procedure provides that discovery responses may be served on the requesting party by mailing the responses to the requesting party's attorney.  <u>See</u> F<span>ED</span>. R. C<span>IV</span>. P. 5(b)(1) and (2).  If service is made by mail, "service is complete upon mailing."  <u>Id.</u> at (2)(C).  "Since [Rule 5] expressly directs that service is complete upon mailing, nonreceipt or nonacceptance of the papers by the person to be served generally does not affect the validity of service." Wright & Miller, <u>Fed. Practice & Procedure</u>, § 1148.  Therefore, despite the fact Red Wilk's counsel never received the original responses, they are deemed received as of the date Hydro's counsel placed them in the mail as evidenced by the certificate of service.  So the Rules themselves show Red Wilk's argument to be baseless.

But last and finally, the court expects better from counsel, especially counsel in South Dakota where our standards are high, our bar collegial, and we

have been (mostly) free of the sharp practices that often characterize law practice in big urban centers in other states.  If counsel for Red Wilk really believed that the requests to admit were deemed admitted and that they provided a valid basis for partial summary judgment, why did counsel wait 18 months to so move?  The court rejects Red Wilk's argument that Hydro never requested an extension of time on all of the bases described above.

Even were there a legitimate factual dispute about whether Hydro requested an extension of time to perform, Red Wilk's argument obviously overlooks the fact that Hydro performed work and billed it to Red Wilk and Red Wilk never paid for that work, even though Red Wilk received payment for the work from Morris.  Clearly, Hydro has a claim to work done and not paid for under the contract completely separate from its claim for damages occasioned by delay.  Also, as the court concluded, *supra*, the contract does not eliminate the normal and ordinary contract damages available under the law to Hydro.

### b.    Acceleration Damages

Because there was allegedly no request for extension of time, Red Wilk seeks to preclude Hydro's claim for acceleration damages.  This argument is dispensed with above, but for the sake of completeness the court addresses the parties' positions.

The court understands Hydro's claim for acceleration damages to represent the additional cost Hydro incurred due to Red Wilk's insistence that Hydro report for work on April 21, resulting in Hydro arriving on the job May 7.[15]  In addition, in mid-June Red Wilk insisted that Hydro finish the project by August 1.  In

_____

[15] Although Hydro arrived on site May 7, it was not ready to begin hydrodemolition work until noon on May 9, 2014.  <u>See</u> Docket No. 161-10 at p. 1.

response, Hydro brought an 8-pack robot and additional personnel to the job site. The court understands this, too, to be part of Hydro's claim for acceleration damages.

Hydro asserts that the contract contained no start date. <u>See</u> Docket No. 198 at p. 7. Therefore, when Red Wilk issued its letter on April 28, 2014, demanding that Hydro report to the job site and start work, Hydro characterizes this demand as a breach of the contract.

Hydro is correct to the extent the contract did not contain a date certain when the work was to commence. However, it did address the start date. The contract stated the date the contract was executed was its commencement date. <u>See</u> Docket No. 158-1 at p. 14-15, § 9.1; Docket No. 158-2 at p. 14-15, § 9.1. The date the contract was executed was April 9, 2014.

Alternatively, the contract stated the "Subcontract Time is the period of time including authorized adjustments, allotted in the Subcontract Documents for Substantial Completion of the Work described." <u>Id.</u> at p. 14, § 9.1. The date for substantial completion of the work was August 1, 2014. <u>Id.</u> at p. 15, § 9.3. The contract provided for 83 working days, with a six-day work week, 10-hour work days, and excluding Sundays and national holidays. <u>Id.</u> at p. 6, § 4.1.16; p. 15, § 9.3. Subtracting 83 days from August 1, 2014, and excluding Sundays and national holidays, the start date would have been April 24, 2014.

As between these two alternate dates—April 9 and April 24—the contract does not specify which date is to control. Additionally, the contract states "[t]he Subcontractor's date of commencement is the date from which the Subcontract Time of § 9.3 is measured; it shall be the date of this Agreement, as first written

66

above, unless a different date is stated below *or provision is made for the date to be fixed in a notice to proceed issued by the Contractor*." <u>Id.</u> at pp. 14-15, § 9.1 (emphasis added). No "different" start date was "stated below" but it is unclear whether there was provision made for the date to be fixed in a notice to proceed by Red Wilk. Red Wilk never argues that its April 28, 2014, letter demanding Hydro begin work was a "notice to proceed" issued pursuant to § 9.1 of the contract.

Although the contract specifies that "time is of the essence," (<u>id.</u> at p. 15, § 9.4), the start date for Hydro to begin its work is ambiguous. Accordingly, parol evidence may be considered. <u>Pauley</u>, 2006 S.D. 73, ¶8, 720 N.W.2d at 668.

Hydro claims it orally told Red Wilk prior to signing the contract that it would not be able to start work on the Fort Randall Dam until late May or even early June, 2014, and that Red Wilk agreed to this. Red Wilk claims the parties orally agreed to an April 21 start date (which itself is different from either of the two dates offered under the contract terms). Whether the parties had an oral agreement that Hydro was allowed to start work in late May or early June and was capable of performing the contract before August 1 even if it did not start work until then is a genuine issue of material fact for the jury. Hence, whether Red Wilk was justified in demanding Hydro arrive at the job site on April 21 is also a material question of fact which is in dispute. Although the contract explicitly gives Red Wilk the power to accelerate work, Red Wilk was free to agree to an early June start date without contradicting that provision. Whether Hydro incurred

unwarranted acceleration expenses in coming to the job site sooner than it had planned to is likewise a question for the jury.[16]

Hydro also claims acceleration damages because, in mid-June, Red Wilk reiterated its insistence on Hydro performing its work on the project by August 1, 2014. Hydro claims this untoward demand by Red Wilk caused it to bring additional personnel and equipment to the job site in July, costing Hydro extra money. Of course, Hydro agreed under the terms of its contract to the August 1 completion date. In general, it would not have been unreasonable for Red Wilk to insist upon observance of that contractual provision.

But Hydro argues that Red Wilk itself was responsible for delaying Hydro's work, making it impossible to finish the job by August 1. There was a formal written request from Hydro to Red Wilk dated May 15, 2014, asking for an extension of time to complete the job due to Red Wilk's delays. See Docket No. 203-32 at p. 1. Acceleration damages arising from the June, 2014, events also presents a question of fact for the jury.

### c. Section 16.2

Red Wilk also points to § 16.2 and argues that provision eliminates Hydro's delay damages. Section 16.2 states, "[t]he Subcontractor waives claims against Contractor for consequential damages arising out of or relating to this Subcontract, including without limitation, any consequential damages due to Subcontractor being terminated." Id. at p. 24, § 16.2. The first observation is that

---

[16] The contract already provided for payment to Hydro of $22,000 to mobilize its equipment and manpower to the job site. Acceleration damages must, therefore, entail something more than only the cost of mobilizing manpower and equipment. Presumably Hydro will adduce proof that it was more expensive to move earlier, or that it had to forgo other work it could have done if allowed to report to the job site later. These are questions that will have to await trial.

§ 16.2 is limited to those situations in which Hydro was *terminated*. Here, no one alleges Hydro was terminated. So the provision is inapplicable. Even if it were applicable, the parties specifically made allowances for certain consequential damages.

Consequential damages are defined as "losses that do not flow directly and immediately from an injurious act, but that result indirectly from the act." Black's Law Dictionary, p. 394 (7th ed. 1999). The general rule is that consequential damages are recoverable if they were foreseeable to the defendant at the time of contracting. Johnson v. John Deere Co., 306 N.W.2d 231, 236 (S.D. 1981); 24 Williston on Contracts § 64:13 (4th ed). Parties may, however, agree under the terms of their contract to limit or eliminate altogether consequential damages so long as such provision is not against public policy or unconscionable. Durham v. Ciba-Geigy Corp., 315 N.W.2d 696, 700 (S.D. 1982); 24 Williston on Contracts § 64:17 (4th ed). Such a provision limiting or excluding consequential damages, like any other contract provision, must be read in light of the contract as a whole. In re Dissolution of Midnight Star, 2006 S.D. 98, ¶ 12, 724 N.W.2d at 337.

Here the contract itself reveals that the parties specifically bargained for and provided for consequential damages for several circumstances anticipated by the parties at the time of contracting. Hydro was in a unique, and unenviable, position. In order to perform its duties under the contract, Hydro depended upon the supply of copious amounts of water on the front end of its hydrodemolition process and also depended upon the prompt clean up of waste water at the site where the concrete was being cut. But these crucial support services were out of Hydro's control—Red Wilk (through ProAct) would be providing these services.

In addition, Hydro could only maximize production of its work by performing hydrodemolition in contiguous passes. But, again, Red Wilk was in control. If Hydro's witnesses are to be believed, Red Wilk never supplied Hydro with a demolition schedule so that Hydro could anticipate where and when it would be working. As a consequence, Red Wilk told Hydro where to cut from day to day and Red Wilk had the power to provide continuous cutting in adjacent areas (high efficiency for Hydro), or require Hydro to hop around from place to place at nonadjacent areas (poor efficiency for Hydro). The contract forbid Hydro from communicating with anyone else on the project except Red Wilk unless Red Wilk gave express permission to do so. See Docket No. 158-1 at p. 7, § 4.1.17.

The contract reflects numerous places where the parties inserted information about the supply of water (p.14, § 8; p.16, § 9.7), clean up of waste water (p. 14, § 8, p.16, § 9.7, p. 17, § 10.6), and providing continuous passes for cutting (p. 16, § 9.7, p. 17, § 10.6). In each case, mention of these items in the contract was tied to idle and standby charges in favor of Hydro or the items were used to precondition Red Wilk's own entitlement to liquidated damages.

Reading the contract as a whole, then, and giving effect to every portion to which it is possible to give effect, the court concludes that Hydro can obtain consequential damages for losses foreseeable to Red Wilk at the time of contracting, but certainly the items specifically provided for in the contract were foreseeable: failure to supply 300 gallons of water continuously, failure to clean up continuously at the robot, and failure to provide contiguous passes of cutting.

In summary, the court concludes that where, as here, there is a contradiction between the "form" "canned" parts of the contract and the portions of

70

the contract which the parties negotiated and discussed particularly and inserted and initialed into the contract, the custom-created provisions control over the "canned" "form" parts of the contract where the two cannot be reconciled. Therefore, the court gives effect to the provisions allowing delay damages in favor of Hydro as found in §§ 8, 9.7 and 10.3 and does not give effect to the contrary provision in § 9.6.[17]  Similarly, the court refuses to read § 16.2 to preclude consequential damages because Hydro was never terminated and because it is inconsistent with the parties' intent to allow consequential damages for specific circumstances addressed in the contract such as providing 300 gallons per minute supply water, cleaning up continuously at the robot, cleaning up wastewater promptly, and providing two phases maximum of continuous cutting.  The court denies Red Wilk's request for partial summary judgment holding that Hydro's sole remedy is to request an extension of time.

### 2.    Delay Damages in Favor of Hydro

Alternatively, Red Wilk argues that Hydro is *entitled to* the damages for idle and standby time as specified in the contract ($3,000 per day) and can obtain no other damages.  Hydro argues it is entitled to idle and standby damages plus other compensatory damages.  Neither party alleges the idle and delay damages are void as a matter of law.  Although the idle and delay damages are a species of liquidated damages, the court finds them valid for the same reasons discussed above in the section on Red Wilk's liquidated damages.

---

[17] In this regard, the court rejects the affidavit from Red Wilk's Jerry MacNeil.  <u>See</u> Docket No. 143.  Mr. MacNeil is attempting to tell the court how to interpret the contract at issue.  Contract interpretation is a question of law for the court to decide.  <u>Cornelius</u>, 813 N.W.2d at 169.  Even if there were ambiguity creating a fact question, that question would go to the jury, not be decided by the court in a summary judgment motion.

The contract between Red Wilk and Hydro references idle and delay damages in several places. In describing the scope of the work to be done, after listing eight items which were Red Wilk's obligation to perform, the contract stated:

> Idle time and standby charges while on project. $3,000/day
>
> Idle and standby charges shall not be assessed if site and weather conditions do not allow work to be completed safely. Standby and idle charges will not be assessed if idle time interferes with the critical timeline tasks and has been scheduled (3) days prior to standby.

See Docket Nos. 158-1 at § 8, p. 14; 158-2 at § 8, p. 14. That exact language is repeated in § 10.3. Id. at p. 17, § 10.3. Also, as noted above, in the provision of the contract describing Red Wilk's entitlement to liquidated damages, the parties inserted "Delay charges in effect" in the provision describing the preconditions to Red Wilk's entitlement to liquidated damages. See Docket Nos. 158-1 at § 9.7, p. 16; 158-2 at § 9.7, p. 14.

Clearly, there are many ways a contract can be breached, causing delay or idle time is just one of those ways. Red Wilk's argument that Hydro is limited exclusively to delay and idle damages leads, if one accepts it, to ridiculous results. For example, if Hydro performed its work fully on the contract and Red Wilk caused no delay or idle time, but refused to pay Hydro for its work, this would be a breach of the contract for which, according to Red Wilk's proposed interpretation, Hydro could receive no damages. This bizarre intent is not found in the contract between Red Wilk and Hydro. Such an intent flies in the face of established contract law. If the parties intended such a result, it would have had to have been clearly and explicitly established in the contract. Cf. Subsurfco, Inc., 337 N.W.2d at 453-54 (holding an intent to make conclusive an engineer's opinion as to damages must be explicitly provided for in the contract; it will not be implied). The

contract contains no such clear and explicit intent. In fact, there are numerous provisions in the contract that seem to explicitly acknowledge Hydro's entitlement to damages aside from idle and standby damages. <u>See</u> Docket No. 158-1 at pp. 10-11, and 13, §§ 4.7, 5.3, 7.3.1; Docket No. 158-2 at pp. 10-11, and 13, §§ 4.7, 5.3, 7.3.1. The court holds Hydro's damages are not limited to idle and standby charges.

South Dakota provides the following regarding contract damages:

> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin.

<u>See</u> SDCL § 21-2-1. The purpose of contract damages is to put the nonbreaching party in the same position it would have been in had there not been a breach. <u>Casper Lodging, LLC v. Akers</u>, 2015 S.D. 80, 871 N.W.2d 477, 490, <u>reversed on other grounds</u>, <u>Magner v. Brinkman</u>, 2016 S.D. 50, 883 N.W.2d 74, 79-80 (reversing as to standard of review on appeal for denial of a motion for judgment as a matter of law, changing the review from abuse of discretion to <em>de novo</em>).

"In order to award contract damages there must be evidence that the damages were in fact caused by the breach." <u>Bunkers</u>, 653 N.W.2d at 743. "Proof of damages requires a reasonable relationship between the method used to calculate damages and the amount claimed." <u>Id.</u> (quoting <u>McKie v. Huntley</u>, 2000 S.D. 160, 620 N.W.2d 599, 603). "In applying this rule, a reasonable certainty test is employed. 'Reasonable certainty requires proof of a rational basis for measuring

loss,' without allowing any room for speculation." Id. (quoting McKie, 620 N.W.2d at 603).

A party suing to recover damages on a construction contract has the burden of showing it substantially performed that contract. Barton Masonry, Inc. v. Varilek, 375 N.W.2d 200, 202 (S.D. 1985). A party may not receive in damages for breach of an obligation more than that party would have received had both parties fully performed their obligations. See SDCL § 21-1-5; Casper Lodging, LLC, 871 N.W.2d at 491. Although a jury may award the lesser measure of damages as between (1) cost of repairs and (2) diminution in value, it is not necessary for the plaintiff to present the jury with evidence of both measures of damage. Casper Lodging, LLC, 871 N.W.2d at 491. If one party presents evidence of only one measure of damage, the opposing party may present evidence of the other measure. Id. at 491-92.

If a plaintiff successfully proves a breach of contract, it "is entitled to recover all [its] detriment proximately caused by the breach, not exceeding the amount he would have gained by full performance. The issue is what [the plaintiff] is entitled to under his contract, less the cost of fully completing it in accord with its terms." Big Band, Inc. v. Williams, 87 S.D. 24, 202 N.W.2d 121, 123 (1972). Where a plaintiff entered into a contract to manufacture defendant's new product, plaintiff was not entitled to recover on its breach of contract claim the costs of tools necessary to perform the contract, other equipment, or the erection of a building. Id. The court held these were ordinary costs of commencing and continuing in business and it would be unfair to charge them to the defendant, whose costs

would be different depending on whether he contracted with a new manufacturer or an established manufacturer with an already-established plant. Id. at 124.

Prejudgment interest on past damages may be obtained from the day of loss until the jury returns its verdict. See SDCL § 21-1-13.1. The interest rate applicable shall be the rate specified in the contract or, if there is none, then at the Category B rate. Id. Prejudgment interest is mandatory, not discretionary. Alvine v. Mercedes-Benz of North America, 2001 S.D. 3, 620 N.W.2d 608, 614. Prejudgment interest applies even though the amount of damages may have been uncertain prior to the jury rendering its verdict. All Star Const. Co, Inc. v. Koehn, 2007 S.D. 111, 741 N.W.2d 736, 742.

The court makes several observations regarding the law and the Red Wilk-Hydro contract. The contract between Red Wilk and Hydro provided for payment of either the sum of $1,361,144.59 or the sum of $1,360,634, to Hydro if Hydro fully performed its obligations under the contract. See Docket Nos. 158-1 at p. 17 and 158-2 at p. 17.[18] In addition to that figure, Hydro was entitled to delay/idle damages caused by Red Wilk and interest on any work done and not paid.

---

[18] The discrepancy between the two figures is as follows. Section 10.1 of the contract specifies a total sum of $1,361,144.59. See Docket Nos. 158-1 at p. 17, 158-2 at p. 17. Section 10.3 of the contract specifies the unit prices as follows:
    Hydrodemolition—6" upstream—40,440 s.f. x $12.83 per s.f.= $518,896
    Hydrodemolition—6" dwnstrm—6,935 s.f. x $15.16 per s.f.   = $105,134
    Hydrodemolition—10" upstrm—29,575 s.f. x $16.49 per s.f.  = $487,692
    Hydrodemolition—10" dwnstm—10,925 s.f. x $20.77 per s.f.= $226,912
    Equipment & manpower mobilization--                       $   22,000
    **TOTAL OF ITEMIZED COSTS:**                          **$1,360,634**

Id. The parties do not take note of, or explain, this $510.59 discrepancy between the stated total of the unit prices in § 10.1 of the contract and the itemized unit prices in § 10.3 of the contract.

Setting aside the matter of delay damages and interest for the moment, Red Wilk billed Morris over $1.2 million for Hydro's work. Morris paid Red Wilk the same amount. However, Red Wilk paid only $475,074 of the money it received from Morris to Hydro. Therefore, under South Dakota contract law, the outer limits of Hydro's damages are $885,560 or, alternatively, $886,070.59 ($1.361 million - $475,074). This is the difference between the contract price, which would have included a profit component, and what Hydro was actually paid by Red Wilk.[19]

Hydro, through its expert Mark Gentry, is claiming $1,159,656 in damages as follows:

| | |
|---|---|
| Unpaid Unit Price Work | $490,616[20] |
| Acceleration Related Damages | $ 92,691 |
| Lost Productivity Damages | $392,748 |
| Unplanned Exec. Oversight/Mgmt. | $ 28,244 |
| Interest | $155,357 |
| **TOTAL CLAIMED DAMAGES** | **$ 1,159,656** |

See Docket No. 162-3 at p. 5. Subtracting the interest included in Hydro's calculation, Hydro is claiming $1,004,299 in damages in addition to the $475,074 it has already received, for a total of $1,479,373.[21] This seems to be an

_____

[19] The "cap" on Hydro's damages is actually probably lower. The $1.36 million figure was based on the contract square footage of 87,875. See Docket Nos. 158-1 at § 8 and 158-2 at § 8. However, the actual square footage removed by Hydro was somewhere between 57,776 and 62,073 square feet. The money due under a unit price contract where the total units end up significantly less than the total anticipated at the inception of the contract would necessarily be less.

[20] The unpaid unit price work in Mr. Gentry's calculation includes billings for delay or idle damages as well as hydrodemolition work done by Hydro. See Docket No. 184-7 at p. 10.

[21] This statement is necessarily qualified by the comments made in the immediately preceding footnote.

impermissible result under SDCL § 21-1-5.  See SDCL § 21-1-5; Subsurfco, Inc., 337 N.W.2d at 455.  None of the parties address SDCL § 21-1-5.

However, it remains for another day and another opinion to sort out the validity of the damages asserted by Hydro through Mr. Gentry.  It suffices for now to conclude that the contract between Red Wilk and Hydro contains no terms which lead this court to conclude the parties intended to supplant the entirety of South Dakota contract damages law when they allowed Hydro to obtain delay and idle charges.  Simply reserving to one party a particular remedy does not deprive that party of other remedies available under the law.  Wolken v. Bunn, 422 N.W.2d 417, 419 (S.D. 1988).  If a contract wishes to eliminate the availability of a lawful remedy, the contract must do so in definite and positive terms showing the parties' clear intention to exclude that remedy or remedies.  Id.  No such language is found in the Hydro-Red Wilk contract.

It is true when parties provide for liquidated damages in a contract, actual damages are not allowed to be proven and recovered if the liquidated damages clause is valid.  Dave Gustafson & Co., 156 N.W.2d at 187.  However, it is also true that liquidated damages are a remedy for a material or total breach of a contract, and where the breach is not material, the liquidated damages clause is usually rejected as an invalid forfeiture.[22]

---

[22] The cases do not use the word "material," but it is clear that is what is being evaluated.  Liquidated damages clauses are upheld when they closely approximate the actual damages the parties anticipate at the time of contracting—and actual damages are evaluated in terms of a material breach.  Heikkila, 378 N.W.2d at 217; Prentice, 355 N.W.2d at 355.  Also, where the amount of liquidated damages is graduated depending on the size of the contract or the number of years the contract is performed, the court has upheld the contract, which also ties the breach to materiality.  Dave Gustafson & Co., 156 N.W.2d at 189; Cactus Heights, 125 N.W.2d at 493-94.

Here, the delay and idle damages were clearly intended by the parties to be compensation for the nonperformance of the support duties Red Wilk owed under the contract which would cost Hydro money—instead of being able to complete its work efficiently and move on to other projects, Hydro would be stalled out on the Fort Randall Dam project due to Red Wilk's inefficiencies in providing water, clean up and waste water handling. Thus, the delay damages provision was not intended to be liquidated damages for a material breach of the contract; nor were delay damages intended to supplant the full panoply of damages otherwise available to Hydro under the law.

If the court were to accept Red Wilk's argument that the delay damages in favor of Hydro precluded any other damages, the same would apply to the liquidated damages provided for Red Wilk under the contract. Under Red Wilk's proffered interpretation, if Hydro performed substandard work under the contract but finished its work on time, Red Wilk would have no remedy. The court refuses such a preposterous interpretation. It is neither sensible, congruent with the contract, nor what the parties anticipated when they entered the contract.

**E.      Morris' Motion for Partial Summary Judgment**

Morris asserts three arguments in favor of its motion. First, it seeks to limit Hydro's damages to the amount of concrete removal verified by a September 15, 2014, survey it conducted. Second, it seeks dismissal of Hydro's *quantum meruit* claim against Morris. And third, it seeks to limit Hydro's damages for "lost productivity" to the $3,000 per day in delay and idle damages specified in the contract between Red Wilk and Hydro.

### 1. Survey Requirement

Morris seeks partial summary judgment in its favor holding that the survey it conducted September 15, 2014, establishes the limits of what Hydro is owed for its hydrodemolition of concrete.[23] That survey documented 57,776 square feet of concrete removed through hydrodemolition, 44,865 square feet at unspecified locations upstream and downstream, and 12,912 square feet at gates 1-21. Hydro resists the motion, asserting that it conducted "field surveys" which establish that it hydrodemolished 62,073 square feet of concrete. Since the contract does not define the term "survey," Hydro asserts that its field surveys also constitute "surveys" for purpose of receiving payment under the contracts.

The contract between Hydro and Red Wilk, as well as the hydrodemolition portions of the contracts between Red Wilk and Morris and between Morris and the Corps, are what is known as "unit price" contracts. That is, the contract is for a specific number of units of work to be paid for at a specified price per unit. When a contract is a unit price contract, the contract usually provides for the payment of progress payments while the work is ongoing and these progress payments are made based upon actual, though approximate, work as it is done. See Subsurfco, Inc., 337 N.W.2d at 458. Progress payments are usually adjusted at the end of the job based on quantities actually verified. Id.

So it is with the Red Wilk-Hydro contract. The contract provides for unit work at a unit price. See Docket No. 158-1 at § 8, pp. 13-14; Docket No. 158-2 at

---

[23] This "survey" argument has application both under subpart C, above, discussing the terms of the Red Wilk-Hydro contract, and also is applicable to Hydro's Miller Act claim as it has bearing on what "labor and materials" Hydro provided to the project. The court chooses to discuss it in conjunction with the Miller Act claim because it was an issue Morris raised, not Red Wilk.

§ 8, pp. 13-14.  It also provides for progress payments along the way.  Id. § 11, pp. 18-20.  Finally, through its incorporation of the prime contract between Morris and the Corps, it provides for a final survey to determine quantities (units) actually verified by survey.[24]  See Docket No. 191-8 at §§ 1.2, 2.2, 4.2, and 5.2, at pp. 20-21; § 3.2.1.1 at p. 93; § 3.8.1 at p. 102.  The Red Wilk-Hydro contract contains an acknowledgement by the parties that, because it is a unit price contract, "[a]ctual supplied and installed quantities shall be verified and final contract price shall directly reflect actual final quantities, contract may increase and decrease based on the variations between actual quantities and estimated quantities."  See Docket No. 158-1 at p. 18, § 10.7; Docket No. 158-2 at p. 18, § 10.7.

Morris claims its September 15, 2014, survey is the only one made and that the contract requires a survey.  Morris is right.  A "survey" is defined as "to determine the exact form, boundaries, position, extent, etc., of (a tract of land, section of a country, etc.) by linear and angular measurements and the application of principles of geometry and trigonometry."  See www.dictionary.com/browse/survey?s=t, last checked August 2, 2017.  Another definition is "to view in detail, especially to inspect, examine, or appraise formally or officially in order to ascertain condition, value, etc."  Id.  Clearly, in the context of a very large federal government construction project, when the contract says that removal amounts will be verified by "survey," it means a formal land survey.  Although, as noted above, progress payments prior to the conclusion of the work may be based on less formal field surveys of the sort Hydro describes.  But the

_____

[24] The Red Wilk-Hydro subsubcontract incorporates by reference the Morris-Red Wilk subcontract.  See Docket No. 158-1 at § 1.1 at p. 2.  The Morris-Red Wilk subcontract incorporates by reference the Morris-Corps prime contract.  See Docket No. 156-2 at § I at p. 1.

amounts verified by field surveys are subject to adjustment when the final survey is done at the conclusion of the work.

Hydro claims Morris waived any requirement for a formal survey of removed amounts of concrete by making progress payments. Waiver applies "where one in possession of any right, whether conferred by law or by contract, and with full knowledge of the material facts, does or forebears the doing of something inconsistent with the exercise of the right." <u>Subsurfco, Inc.</u>, 337 N.W.2d at 455. To demonstrate waiver, "there must be a showing of a clear, unequivocal and decisive act or acts showing an intention to relinquish the existing right." <u>Id.</u> Here, the contract itself provided for progress payments. <u>See</u> Docket No. 158-1 at p. 18-20, § 11; Docket No. 158-2 at pp. 18-20, § 11. The requirement of a formal survey only applied at the conclusion of the work, not to interim progress payments.

Morris did not waive the survey requirement by making progress payments based on less formal methods of measurement prior to completion of the work. Morris' progress payments were in conformity with the contract, not a voluntary relinquishment of rights contrary to a contractual provision. Although waiver is usually a question of fact for the jury, here Hydro fails to show that Morris' actions were in any way contradictory to a known right of Morris under the contract.

Even though the final amount due under the contract for unit price work must be determined with a formal survey, there is a dispute about the amount of square footage demonstrated by the survey, how much of that square footage is attributable to Hydro as opposed to 2X, how many square feet the Corps paid

Morris for, and whether the survey amount is subject to adjustment because of Morris' knowledge of Red Wilk's malfeasance.

In Morris' initial brief in support of its motion for partial summary judgment, Morris stated that it "had a survey performed on September 15, 2014, shortly after American Hydro abandoned the project, which revealed only 44,865 square feet of concrete had been removed. . . Morris utilized the September 15, 2014, survey for its pay request to the [Corps] and was paid accordingly. . ." See Docket No. 154 at pp. 6, 9-10. In its subsequent reply brief, Morris accuses Hydro of "misstating the record" when Hydro suggested Morris was claiming Hydro should only be paid for 44,865 square feet of concrete removal. To the contrary, this court also understood Morris' original brief as "suggesting" exactly that—that Hydro was entitled to be paid for only 44,865 square feet.

But in its reply brief, Morris states that the survey actually shows a total of 57,776 square feet of concrete was removed by Hydro. See Docket No. 214 at p. 3. In addition, although Morris states it was paid by the Corps for only 62,000 square feet of concrete removed (57,776 by Hydro and approximately 6,000 removed by Hydro's successor, 2X), Morris provides the court with no citation to the record demonstrating that is what the Corps paid Morris or that this is what 2X was paid.

Hydro provided an email from November 26, 2014, sent by Morris' agent stating that *Morris' survey* showed Hydro removed and was paid for 68,000 square feet of concrete. See Docket No. 203-38 at p.1. Of course, that figure was really determined later to be 62,000 square feet. What is relevant about the email is (1) the figure *Morris* recited therein is based on *Morris' survey* and (2) at that time, Morris was attributing 62,000 square feet of concrete removal to Hydro, not

57,776.  The survey requirement controls the amount of unit price work to be paid for under the contract, but *the amount* attributable to Hydro pursuant to that survey is a factual question for the jury.

In addition, Hydro claims one of the ways Red Wilk breached the contract was to fail to wash away debris and waste water promptly.  In fact, Morris acknowledged that Red Wilk's clean up of hydrodemolished areas often lagged *months* behind Hydro's actual hydrodemolition work.  See Docket No. 203-38 at p. 1.  When debris and slurry are allowed to remain in the hydrodemolished areas, sediment can resolidify, thus obscuring the totality of the hydrodemolition that was performed.  Morris' survey was conducted approximately one month after Hydro left the job site.

Hydro is entitled to be paid, by Red Wilk if not by Morris, for the entirety of its work on the project, not just for the amounts that can be determined after wastewater and sediment have been allowed to partially fill in previously hydrodemolished areas.  Morris knew this was a complicating factor in measuring the amount of hydrodemolition done by Hydro.  Id.  Hydro submitted proof that it billed Red Wilk for 62,000 square feet of concrete removed through hydrodemolition verified by field surveys and that Morris paid Red Wilk for the entirety of that billing, thus supporting Hydro's assertion that it removed more concrete than documented by the September, 2014, survey.

The total amount of verifiable work done by Hydro thus presents a fact question for the jury.  Morris can argue its position to the jury.  If Hydro is able to establish with reasonable certainty that it performed quantities of work that were then obscured by Red Wilk's failure to promptly clean away the debris and waste

water, Hydro may argue its position to the jury—and may attempt to prove Morris knew of this. Both parties are free to adduce evidence about the division of the 62,000 square feet of concrete removal as between Hydro and 2X. The court concludes summary judgment on this issue is not proper as genuine issues of material fact exist.

### 2. Quantum Meruit

Morris also seeks partial summary judgment in its favor dismissing Hydro's claim for *quantum meruit*. It argues that *quantum meruit* does not lie where there is an actual, explicit contract. Morris also argues that Hydro would have to prove Morris was unjustly enriched. Since Morris paid Red Wilk in full for all work billed by Hydro, Morris argues Hydro cannot show *Morris* was unjustly enriched (even though Red Wilk may have been).

Hydro counters that there is no express contract between it and Morris which would prevent a *quantum meruit* claim. Further, Hydro argues that, under the law, it need not show Morris received a benefit from Hydro's services.

An implied contract or *quantum meruit* "is a fiction of the law adopted to achieve justice where no true contract exists." Weller v. Spring Creek Resort, Inc., 477 N.W.2d 839, 841 (S.D. 1991). Unjust enrichment contemplates an involuntary or nonconsensual transfer, unjustly enriching one party. The equitable remedy of restitution is imposed because the transfer lacks an adequate legal basis." Johnson v. Larson, 2010 S.D. 20, 779 N.W.2d 412, 416. There are two types of implied contracts: contracts implied in fact and those implied in law. Thurston v. Cedric Sanders Co., 80 S.D. 426, 125 N.W.2d 496, 498 (1963). Contracts implied at law do not arise because the parties intended to create a

contract; rather, they arise where necessary under equity to prevent one person from enriching himself unjustly at the expense of the other.  Id.

Contracts implied in fact arise where the parties' intention to create a contract is not manifested by words, but is gathered by implication from the parties' conduct, language used, acts done, or other pertinent circumstances surrounding the transaction.  Weller, 477 N.W.2d at 841; Mahan v. Mahan, 80 S.D. 211, 121 N.W.2d 367, 369 (1963).  "[I]f a party voluntarily indulges in conduct reasonably indicating assent he may be bound even though his conduct does not truly express the state of his mind."  Weller, 477 N.W.2d at 841 (quoting Fed. Land Bank of Omaha v. Houck, 68 S.D. 449, 4 N.W.2d 213, 219-20 (1942)).  The terms of an implied in fact contract "are manifested by conduct" of the parties.  Lien v. McGladrey & Pullen, 509 N.W.2d 421, 423 (S.D. 1993).  "Under South Dakota law, the existence of an implied contract between the parties creates a genuine issue of material fact that must be decided by a jury."  Id. at 424; Jurrens v. Lorenz Mfg. Co. of Benson, MN, 1998 S.D. 49, 578 N.W.2d 151, 154.

 An implied contract, whether one of law or one of fact, is subject to a higher standard of proof.  Mahan, 121 N.W.2d at 369.  The plaintiff seeking to prove the existence of an implied contract must establish it by clear and convincing evidence.  Id.

"Where there is a valid express contract *between parties* in relation to a transaction *fully fixing the rights of each*, there is no room for an implied promise, or suit on quantum meruit."  Surgical Institute of SD, PC v. Sorrell, 2012 S.D. 48, 816 N.W.2d 133, 141 (quoting Aetna Life Ins. Co. v. Satterlee, 475 N.W.2d 569, 574 (S.D. 1991)) (emphasis added).  See also Johnson, 779 N.W.2d at 416;

Jurrens, 578 N.W.2d at 153 (both holding no implied contract or unjust enrichment claim lies where the rights of the parties are controlled by express contract). In such a case, summary judgment on a claim of implied contract is appropriate. Surgical Institute of SD, PC, 816 N.W.2d at 141. Where, however, no contract exists or the dispute centers on a subject *not addressed* by the contract, an issue of fact is created and *quantum meruit* may apply as to that subject. See ABC Elec., Inc. v. Nebraska Beef, Ltd., 249 F.3d 762, 767 (8th Cir. 2001) (applying Nebraska law).

In Nebraska Beef, Nebraska Beef was the owner of a slaughtering and beef processing plant. Id. at 764. It hired a general contractor to renovate and expand the premises. Id. The general contractor then entered into a subcontract with ABC to provide the electrical work. Id. The primary issue at trial was the scope of the work under the ABC subcontract. Id. at 765. The prime contract and the subcontract had both been entered into at a time when the general contractor and ABC had already begun work on the project, but before Nebraska Beef defined the scope of work beyond that described in some architectural drawings. Id. at 767. It was the work *in addition to* the work depicted in the architectural drawings that was the nub of the dispute. Id. at 765.

The court noted that ABC's *quantum meruit* claim did *not* include work for which Nebraska Beef had paid the general contractor—the claim involved extra work in addition to that which had been paid for through the general contractor. Id. Furthermore, Nebraska Beef had been directly involved with ABC, supervising part of the project directly, controlling the entire project, giving final approval to change orders, and directly paying ABC for work performed. Id. Although noting

that a party may not sue under *quantum meruit* for work it did pursuant to an express contract, the court held a party *may* recover reasonable pay for work not covered by the contract.  Id.

The express contract required ABC to perform electrical work for the sum of $880,000.  Id.  The critical issue, as regards ABC's *quantum meruit* claim, was determining *what work* was covered by that $880,000.  Id.  The district court interpreted the contract to unambiguously mean that ABC's work in exchange for the $880,000 payment was *only* that work described in the architectural drawings; any work in addition to that specified in the drawings was in addition to the contract work and, therefore, not covered by the contract.  Id.  The Eighth Circuit affirmed, holding that *quantum meruit* was appropriate under these circumstances.

In the Johnson case, a farmer had orally agreed with a contractor that the contractor would remove rock and install drain tile on the farmer's land.  Johnson, 779 N.W.2d at 414-15.  The contractor's compensation was to receive the value of the rock and to be allowed to store the rock on the farmer's land until the contractor needed it.  Id.  The farmer later gave the rock away to a third party in order to get it off his land after repeated inquiries to the contractor about removing the rock went unanswered.  Id.  The contractor sued the farmer for breach of contract and lost.  Id. at 415.  The contractor also brought equitable claims against the farmer and the third party which the court decided in favor of the contractor.  Id.

On appeal, the court held it was error to imply a contract between the farmer and the contractor because there *was* already an express, though oral, contract between them and that contract controlled the rights of the parties.  Id. at

416. However, as to the contractor and the third party who received the rock, there was no express contract. Id. at 416. As to the third party, the court stated the contractor was required to prove (1) the third party received a benefit, (2) he was aware he was receiving a benefit, and (3) it would be inequitable to allow him to retain the benefit without paying for it. Id. The court affirmed the trial court's equitable holding in the contractor's favor as to the third party. Id. at 417.

In discussing the damages awarded on that equitable claim, however, the court had to choose between (1) awarding damages based on the time, effort, and cost to the contractor of excavating the rocks or (2) awarding damages based on the value of the benefit to the third party. Id. This, the court held, was the difference between *quantum meruit* and unjust enrichment. Id. at 417-18. *Quantum meruit* requires the plaintiff to prove the defendant requested the plaintiff's services and the plaintiff reasonably expected to be paid. Id. at 417. If these elements are proved, damages may be awarded even if the defendant did not benefit from the plaintiff's services. Id. at 417-18.

Unjust enrichment allows an award of restitution based on the value of the benefit conferred rather than the value of the service provided. Id. at 418. The key thing is that the defendant must be unjustly *enriched.* Id. Under the facts of this case, where there was no wrongdoing on the part of the third party who received the rocks, the third party did not request the contractor's services, and the contractor did not reasonably expect to be paid by the third party, the court held the proper measure of damages was unjust enrichment—the value of the benefit received by the third party. Id. The Johnson court disavowed an earlier statement in Burch v. Bricker, 2006 S.D. 101, 724 N.W.2d 604, 609, stating that

*quantum meruit* was a remedy for unjust enrichment.[25]  <u>Johnson</u>, 779 N.W.2d at 417 n.2.

Hydro argues its claim is for *quantum meruit*, not unjust enrichment, and that Hydro need not prove unjust enrichment for a *quantum meruit* claim.  That much is true.  <u>Johnson</u>, 779 N.W.2d at 417-18.  But *quantum meruit* requires the plaintiff to prove *the defendant* requested the plaintiff's services and the plaintiff reasonably expected to be paid.  <u>Id.</u> at 417.  Here, Hydro has not shown that Morris requested Hydro to perform services for Morris.  Rather, the facts show that *Red Wilk* is the party who requested Hydro to perform services for Red Wilk.  The district court has already determined that Hydro cannot assert a *quantum meruit* claim against Red Wilk because an express contract controlled the relationship between Red Wilk and Hydro.  <u>See</u> Docket No. 39.

The facts presented on this summary judgment motion do not neatly fit within the <u>ABC</u> case or the <u>Johnson</u> case.  Unlike <u>ABC</u>, here, Morris *did* pay Red Wilk for Hydro's services; Red Wilk just failed to pass that payment along in full to Hydro.

Morris also billed the Corps for Hydro's work and received payment.  As discussed in connection with the discussion of the survey requirement though, it is not apparent how much the Corps paid Morris for Hydro's work.  If the Corps paid Morris for 62,000 square feet of concrete removed by Hydro, Morris would be

---

[25] Counsel for Morris quotes the discredited statement from <u>Burch</u> in its brief: "Quantum meruit is 'used as an equitable remedy to provide restitution for unjust enrichment.' "  <u>See</u> Morris Brief at Docket 154, p. 14.  <u>Johnson</u> overruled this very statement, so it is no longer good law, a fact counsel should have noted in its brief. Presumably Morris' counsel did read <u>Johnson</u> as counsel cited to <u>Johnson</u> in its brief along with <u>Burch</u>.  However, the court notes no "flag" showing negative treatment of <u>Burch</u> appears when the case is viewed on Westlaw.com.

unjustly enriched if it only compensated Hydro for 57,776 square feet. It is unknown on this record if Morris has reaped an unjust enrichment like the third party in <u>Johnson</u> or Nebraska Beef in <u>ABC</u>.

Morris argues that, unlike the subcontractor in <u>ABC</u>, here Hydro is not alleging it performed work outside the scope of its subcontract--the work Hydro did was specifically pursuant to the terms of its contract with Red Wilk. However, if Hydro did work amounting to 63,000 square feet of concrete removal and Morris' position is that only 57,776 square feet are within the contract, then conceivably Hydro *did* do work outside the contract to the tune of approximately 5,000 square feet of concrete removal. Finally, neither party addresses whether, like Nebraska Beef, Morris directly supervised and directed Hydro or ever made payments directly to Hydro, bypassing Red Wilk.

On this record, the court finds factual issues abound and Morris is not entitled to summary judgment on Hydro's *quantum meruit* claim. This issue will be decided after a full trial.

### 3. Lost Productivity Damages

Morris argues that the provision in the contract for delay and idle charges in favor of Hydro prohibits Hydro's claim for damages for loss of productivity. Morris equates lost productivity damages with damages arising from delay or idle time caused by Red Wilk. If that were true, the court might agree with Morris.

However, Hydro argues that its lost productivity damages stem from more than just delay and idle time caused by Red Wilk. Hydro alleges the following acts by Red Wilk caused Hydro's lost productivity damages: failure to conduct cleanup of concrete removal areas, failure to provide 300 gallons per minute of water for

90

hydrodemolition, failure to provide saw cutting around the perimeters of the areas to be hydrodemolished, failure to provide two phases only of continuous cutting, and demanding that the work be completed by August 1, which in turn caused Hydro to bring an 8-pack pump and additional personnel to the work site, which was less efficient.

The allegations that Red Wilk failed to clean up, failed to provide water, and failed to provide two continuous passes of cutting are specifically contemplated as sources of delay and idle payments under the contract. These acts by Red Wilk cannot form the basis for lost productivity damages because they are already covered by idle and delay charges, a form of liquidated damages agreed to by the parties for this type of delay.

The failure to provide saw cuts around the perimeter of areas to be hydrodemolished was not contemplated in the idle and delay damages. This is a species of default by Red Wilk that would not be covered by the liquidated damages. Therefore, to the extent Hydro can show with reasonable certainty that failure to provide saw cuts resulted in measurable loss of productivity to Hydro, Hydro can recover these damages.

As to the fact Red Wilk insisted Hydro finish the work by August 1, that may or may not be recoverable as part of Hydro's claim for lost productivity damages. The contract between Red Wilk and Hydro quite clearly set forth an August 1, 2014, completion date and also set forth the fact that time was of the essence in this contract. Hydro promised to finish the work on time when it signed the contract.

On the other hand, Hydro alleges Red Wilk itself was the cause of Hydro falling behind on the schedule and finishing work on August 25 instead of August 1. The contract obligated Red Wilk to grant extensions of time to complete the work when such requests were reasonable. As already established, Hydro did request extensions of time and Red Wilk refused. The cause of the delay, and whether Red Wilk's refusal to grant an extension was unreasonable, are disputed questions of material fact which await the jury. The court will not grant summary judgment on this ground.

## CONCLUSION

Based on the foregoing law, facts and analysis, it is hereby

ORDERED that Hydro's motion for partial summary judgment [Docket No. 170] is granted as to liability against Morris and UF&CC on Hydro's Miller Act claim. The remainder of Hydro's motion for partial summary judgment is denied in all other respects. It is further

ORDERED that the motions for partial summary judgment by Morris [Docket No. 153] and by Red Wilk [Docket No. 140] are denied in their entireties.

DATED August 8, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge